FREEMAN v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. August 25, 1915.)

No. 311.

1. CRIMINAL LAW ⬳1106—APPEAL—TRANSCRIPT OF RECORD—TIME FOR FILING.

The failure of an appellant or plaintiff in error to file a transcript of the record in the Circuit Court of Appeals within the time fixed by the rules is not jurisdictional, and for good cause shown the court may in its discretion permit it to be filed subsequently.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2890–2892; Dec. Dig. ⬳1106.]

2. CRIMINAL LAW ⬳1106—APPEAL—TIME FOR FILING TRANSCRIPT—DISMISSAL.

A plaintiff in error in a criminal case did not file a transcript of the record until more than two years after return day of the citation and writ of error, when, under the rules, it should have been filed, unless the time was extended. The time was extended from time to time through several months, and the case was then placed on the calendar with the consent of counsel for both sides, and with the knowledge by them and by the court that the transcript had not been filed. Counsel for the government appeared in the case several times afterward without objection

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

on that ground, but four days before filing of the transcript moved for dismissal. The transcript was unusually large, and its preparation and printing involved much time and large expense; also for several months a motion for new trial in the court below and consequent proceedings which might have rendered the error proceedings unnecessary were pending. *Held*, that the placing of the case on the calendar was equivalent to an indefinite enlargement of the time for filing the transcript, and that under the facts the government was not entitled to a dismissal.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2890–2892; Dec. Dig. ☞1106.]

3. CRIMINAL LAW ☞1106—APPELLATE PROCEEDINGS—BILL OF EXCEPTIONS— TIME FOR SETTLING—CONSENT TO EXTENSION.

A district attorney, by consenting to and stipulating for extensions of the time for settling the bill of exceptions in a criminal case after the term, by requesting delay and to some extent causing the same by remissness in furnishing necessary exhibits, *held* to have acquiesced to a degree amounting to an implied agreement that the time should be extended until the bill was finally settled, which rendered it inequitable to ask for a dismissal because of the delay.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2890–2892; Dec. Dig. ☞1106.]

4. CRIMINAL LAW ☞991—JUDGMENT—CONVICTION ON DIFFERENT COUNTS.

There can be but one judgment on a conviction in a criminal case, although based on a number of counts or indictments consolidated for trial.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2518, 2525, 2528; Dec. Dig. ☞991.

Consolidation of and trial of indictments together, see note to Dolan v. United States, 69 C. C. A. 287.]

5. CRIMINAL LAW ☞634—CONSTITUTIONALITY OF COURT—SUBSTITUTION OF JUDGE DURING TRIAL.

To a constitutional trial of a defendant charged with a felony in a court of the United States, the continuous presence of a judge and a jury of 12 men is essential, and another judge cannot lawfully be substituted for the one before whom the trial was commenced, during its progress, and while the testimony is being taken.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1461–1464; Dec. Dig. ☞634.]

6. JURY ☞9—"TRIAL BY JURY"—PRESENCE OF JUDGE.

The constitutional right to "trial by jury" in federal courts means a trial by 12 men, presided over by a judge.

[Ed. Note.—For other cases, see Jury, Cent. Dig. § 14; Dec. Dig. ☞9.]

For other definitions, see Words and Phrases, First and Second Series, Trial by Jury.]

In Error to the District Court of the United States for the Southern District of New York.

Criminal prosecution by the United States against Albert Freeman. Judgment of conviction, and defendant brings error. Reversed.

See, also, 204 Fed. 1006, 122 C. C. A. 663.

This cause comes here on writ of error to the United States District Court for the Southern District of New York. The questions raised relate to the indictments, trial, verdict, sentence, and bill of exceptions in the prosecution by the United States against Albert Freeman, who was indicted and tried with William J. Morton, Julian Hawthorne, Josiah Quincy, and John McKennon who were jointly indicted in five different indictments. The indictments charged the defendants with having unlawfully and willfully con-

spired against the United States, and with having agreed together to devise a scheme and artifice to defraud diverse persons, whose names were unknown, of their money and property, by inducing, by false and fraudulent representations and pretenses, such persons to part with their money and property in the purchase of shares of the capital stock of certain mining corporations, and for using the post office establishment of the United States for the purpose of executing their fraudulent scheme.

The defendant Freeman was found guilty on all of the counts of all of the indictments except those abandoned by the government, and the conspiracy count of one of the indictments. A verdict of not guilty was directed in behalf of the defendant Quincy on all counts of all indictments, except a conspiracy count in one indictment, and on that count the jury returned a verdict on his behalf of not guilty. The defendants Hawthorne and Morton were found not guilty on all the counts of one of the indictments, but guilty on all other counts of all other indictments except those abandoned by the United States. Freeman was sentenced to five years' imprisonment on certain counts, and on the other counts upon which he was convicted sentence was suspended. Hawthorne and Morton were each sentenced to imprisonment for one year and one day. Thereupon the United States attorney moved that the term of the court be extended for five years as to each count on which sentence was suspended, and the motion was granted. Neither Hawthorne nor Morton took out a writ of error, and each has served out his sentence. Freeman has served no part of his sentence and is out on bail in the sum of $150,000.

Wilson B. Brice, of New York City (Thomas W. Proctor and Damon E. Hall, both of Boston, Mass., of counsel), for plaintiff in error.

H. Snowden Marshall, U. S. Atty., and Goldthwaite H. Dorr and Claude A. Thompson, Sp. Asst. U. S. Attys., all of New York City.

Before LACOMBE, WARD, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge. The defendant, having been convicted and sentenced to five years' imprisonment, comes into this court complaining of various errors which he alleges occurred during his trial. The trial in some respects was a remarkable one and lasted for four months. The evidence is voluminous and the record is contained in ten large volumes of 7,000 printed pages. The charge of the trial judge covers 87 pages and the requests to charge, on behalf of the defendant, were 86. The defendant has filed 210 assignments of error, and the court is asked especially to consider 91 of these assignments. But before considering any of these alleged errors it is necessary to consider a motion that the writ of error be dismissed.

[1, 2] It is claimed by the government that as the transcript of record was not filed in this court during the term next succeeding the return day named in the citation and writ of error, this court is without jurisdiction to hear the case. It is also averred that there is no lawful bill of exceptions before the court, as the District Judge did not sign and settle the same during the term at which the judgment of conviction was entered. Judgment of conviction was entered on March 14, 1913; writ of error was sued out on March 24, 1913; the citation was returnable on April 23, 1913; the bill of exceptions was noticed for settlement on December 12, 1914, and was settled on February 24, 1915, over the government's objection that the term of the court at which the judgment was entered had long since expired. The transcript of record was not filed in this court until April 27, 1915, and on

April 23d the government moved to dismiss the writ of error. We postponed argument on the motion until the case could be heard on the writ of error, preferring to hear argument on the whole case at the same time.

We will consider first the motion to dismiss on the ground that the court is without jurisdiction, because of the failure of the defendant to file the transcript of record within the proper time. The jurisdiction of this court can be exercised only over the matters committed to it by the statutes of the United States and only on the terms and in the manner provided by the statutes. Revised Statutes, § 997 (Comp. St. 1913, § 1653), provides that:

"There shall be annexed to and returned with any writ of error for the removal of a cause, at the day and place therein mentioned, an authenticated transcript of the record, an assignment of errors, and a prayer for reversal, with a citation to the adverse party."

And rule 16 of this court provides that:

"It shall be the duty of the plaintiff in error or appellant to docket the case and file the record thereof with the clerk of this court by or before the return day mentioned, whether in vacation or in term time. But for good cause shown the justice or judge who signed the citation, or any judge of this court, may enlarge the time by or before its expiration, the order of enlargement to be filed with the clerk of this court." 188 Fed. xi, 109 C. C. A. xi.

The rule then goes on to provide that, if the plaintiff in error or appellant fails to comply with the rule, the defendant in error or appellee may have the cause dismissed. Rule 16 of this court is substantially the same as rule 9 of the Supreme Court of the United States. 29 Sup. Ct. vii.

The time for filing the transcript in the case at bar had been extended from time to time by court order or by stipulation of counsel until September 15, 1913. At that time, or about that time, the case was by the order of this court, or of one of its judges, placed on the calendar, with the consent of the attorneys on both sides, and with full knowledge that the transcript had not been filed. The Supreme Court has in numerous cases announced that it has no jurisdiction to hear and determine a case where the transcript has not been filed during the term next succeeding that in which the writ of error was sued out or the appeal was taken. Antonio Maria Peralta v. State of California, 235 U. S. 686, 35 Sup. Ct. 203, 59 L. Ed. 425 (1914); Green v. Elbert, 137 U. S. 615, 11 Sup. Ct. 188, 34 L. Ed. 792 (1890); Richardson v. Green, 130 U. S. 104, 9 Sup. Ct. 443, 32 L. Ed. 872 (1888); Credit Company v. Arkansas Central Ry. Co., 128 U. S. 258, 9 Sup. Ct. 107, 32 L. Ed. 448 (1888); Hill v. Chicago, etc., Ry. Co., 129 U. S. 170, 174, 9 Sup. Ct. 269, 32 L. Ed. 651 (1889); Norton v. Commissioners, etc., 129 U. S. 505, 9 Sup. Ct. 331, 32 L. Ed. 784 (1889); Fayolle v. Texas & Pacific R. Co., 124 U. S. 519, 8 Sup. Ct. 588, 31 L. Ed. 533 (1888); Radford v. Folsom, 123 U. S. 725, 8 Sup. Ct. 334, 31 L. Ed. 292 (1887); Caillot v. Deetken, 113 U. S. 215, 5 Sup. Ct. 432, 28 L. Ed. 983 (1885); State v. Demarest, 110 U. S. 400, 4 Sup. Ct. 25, 28 L. Ed. 191 (1884); The Tornado, 109 U. S. 110, 3 Sup. Ct. 78, 27 L. Ed. 874 (1883); Mussina v. Cavazos, 6 Wall. 355, 358, 18

L. Ed. 810 (1868); Mesa v. United States, 2 Black, 721, 17 L. Ed. 350 (1862); United States v. Fremont, 18 How. 30, 15 L. Ed. 302 (1855).

In Mussina v. Cavazos, supra, Mr. Justice Miller explained the ground on which the decisions are based by saying that they rest on the general principle that all writs which have not been served, and under which nothing has been done, expire on the day to which they are made returnable.

"They no longer," he said, "confer any authority; an attempt to act under them is a nullity; and new writs are necessary, if the party wishes to proceed."

In Grigsby v. Purcell, 99 U. S. 505, 507, 25 L. Ed. 354 (1878) Mr. Chief Justice Waite, speaking for the court, declared:

"It by no means follows, as seems to be supposed by counsel who resist this motion, that if parties appear and without objection go to a hearing in a cause docketed after the return term, our judgment will be void for want of jurisdiction. The real objection is not that this court has no jurisdiction, but that the plaintiff in error, or the appellant, as the case may be, has failed to duly prosecute his suit; and this objection may be taken advantage of by the court upon its own motion, or by the appellee or the defendant in error at any time before hearing."

In that case the appeal was granted on February 23, 1875, the transcript of record was not filed until August, 1876, and the appeal was dismissed. The Supreme Court, in laying down the rule that the transcript must be filed during the term next succeeding the allowance of the writ of error or of the appeal, nevertheless recognizes that the rule is subject to exceptions. In United States v. Gomez, 3 Wall. 752, 763, 18 L. Ed. 212 (1865), Mr. Justice Clifford says that certain exceptions to the rule are recognized and allowed, "which are as well established as the rule itself." The exceptions which he names are: (1) Where the party who takes the appeal is prevented from obtaining the transcript by the fraud of the other party; (2) where he is prevented from obtaining the transcript by the order of the court; (3) or where he is prevented from obtaining it by the contumacy of the clerk. In such cases the failure to file within the prescribed period will not be regarded by the court as fatal if it appears that the appellant has not been guilty of laches or want of diligence. In that case the appeal was allowed August 25, 1862, and the transcript was filed on February 29, 1864. The petition was dismissed.

We do not understand that the exceptions to the rule above enumerated are intended as necessarily exclusive of all others. For in Bingham v. Morris, 7 Cranch, 99, 3 L. Ed. 281 (1812), a motion was made to dismiss a writ of error for not filing the transcript of the record within the time fixed by the general rule, and the court overruled the motion and said that they "did not consider the rule as applying to any case where the transcript shall have been filed before the motion for dismissal." In Green v. Elbert, supra, Chief Justice Fuller, in applying the rule, mentions the fact that delay on the part of opposing counsel in asking to have the case dismissed because of failure to file the transcript as required "has sometimes been referred to as an ele-

ment in combination with others, justifying leniency in its disposition. In that case the term during which the transcript should be filed closed May 14, 1888. The transcript reached the clerk on May 10, 1888. But under the rule it could not be filed until the fee was paid, and the fee was not paid until January 13, 1890. The transcript was filed as of that date and the cause docketed. The court held the laches was too gross to be passed over, as the counsel was a member of the bar of the court and knew that the rule required the payment of the fee. In Grigsby v. Purcell, supra, the court pointed out that:

"To entertain the cause under such circumstances [failure to file according to the rule] would be to encourage an addition to the already burdensome delay necessarily attendant upon litigation in this court on account of the crowded state of the docket. Instead of this, we should, as we do, insist on promptness and activity by all who come here to obtain a re-examination of judgments and decrees against them."

But the rule may sometimes operate to create still longer delay and additional expense. For the court has, on several occasions, in dismissing a case because of the failure to file the transcript within the time allowed by the rule, pointed out that the dismissal would not deprive the party of his right to begin his appeal de novo, provided he did so within the time allowed for the taking of appeals. See United States v. Curry, 6 How. 106, 12 L. Ed. 363 (1848); Steamer Virginia v. West, 19 How. 182, 15 L. Ed. 594 (1856).

We pass on to consider the construction which the Circuit Courts of Appeals have placed upon the rules which they have established governing appeals coming from the District Courts.

The Fourth Circuit, in Pender v. Brown, 120 Fed. 496, 56 C. C. A. 646 (1903), dismissed the writ of error on the ground that it had no jurisdiction, as the writ, together with the record, had not been returned to the next ensuing term to which it was made returnable; no sufficient cause having been shown why it had not been so returned. There is no discussion of what would constitute sufficient cause. And the same court took similar action as to an appeal for a like reason in Williams Bros. v. Savage, 120 Fed. 497, 56 C. C. A. 647 (1903).

The Fifth Circuit, in Freeman v. Clay, 48 Fed. 849, 1 C. C. A. 115 (1891), held that the citation on appeal must be made returnable not exceeding 30 days from the day of signing, whether the return day fall in vacation or in term time, but that a defect in such particulars is cured by the filing of the transcript and an entry of a regular appearance by appellees' counsel. "No injury," said the court, "to appellees has resulted." In State of Florida v. Charlotte Harbor Phosphate Co., 70 Fed. 883, 886, 16 C. C. A. 682 (1895), the same court held that the rules of the Circuit Court of Appeals in regard to the return day of appeals and to the filing of the transcript are directory, and that it is within the sound discretion of the court to relieve parties who have not complied therewith. That court had the matter before it again in Love v. Busch, 142 Fed. 429, 431, 73 C. C. A. 545 (1906). The transcript had not been filed within the time fixed by the rules of the court, and the citation in error was not made returnable within the required period. On both grounds the court was asked to dismiss

227 F.—47

the bill, and declined to do so on either ground, although it was ordered dismissed on the merits. The court said:

"In either case our rules have not been complied with; but we notice that the appellees have duly appeared, and that no injury has resulted from the noncompliance with the rules, and as they are directory, and not jurisdictional, we are doubtful as to the justice of applying any penalty, and particularly such a harsh penalty as would be the dismissal of the appeal."

The Sixth Circuit, Judges Taft and Lurton, in Altenberg v. Grant, 83 Fed. 980, 28 C. C. A. 244 (1897), held that a writ of error will not be dismissed by the Circuit Court of Appeals because return thereof is not made until one day after it is returnable by its terms. Judge Taft said:

"Nor do we regard the objection that the writ was returned and the record filed here one day after it was made returnable of serious moment. Bingham v. Morris, 7 Cranch, 99 [3 L. Ed. 281], shows that, if the transcript of the record is filed before the motion for dismissal, the motion will not be granted."

The Seventh Circuit in Chicago Dollar Directory Co. v. Chicago Directory Co., 65 Fed. 463, 466, 13 C. C. A. 8 (1895), held that an appeal would not be dismissed where the copy of the record was not filed with the clerk of the appellate court within 30 days from the time the order was entered in the court below, where the transcript was subsequently filed unless a motion to docket and dismiss had been previously made.

The Eighth Circuit, in McClellan v. Pyeatt, 49 Fed. 259, 1 C. C. A. 241 (1892), held that where the citation is made returnable 60 days after its date (as allowed by the rule) and the writ of error on a day named which is less than 60 days therefrom, the writ will not be dismissed, where the record is filed thereafter, but within 60 days, though the rule requires the record to be filed "by or before the return day." The same court, in Incorporated Town of Gilman v. Fernald, 141 Fed. 940, 72 C. C. A. 666 (1905), Judges Sanborn, Hook, and Adams, held that where a transcript of the record is filed in the Circuit Court of Appeals within 60 days from the signing of the citation and within the time specified therein, but after the return day of the writ of error and the failure to file it before that return day has not continued the hearing of the case over any term of court, and no motion to dismiss the writ is made until the expense of printing the transcript has been incurred, the writ will not be dismissed.

This review of the decisions shows that there is not absolute unanimity in the federal courts as to the rule regarding the filing of the transcript and the exceptions to be made to it. But upon careful consideration of all the unusual circumstances of this extraordinary case this court does not think that the government is entitled to have the case dismissed on the ground that the writ of error has become functus officio because of the failure of the plaintiff seasonably to prosecute this appeal. The writ was not functus officio when the case was ordered on the calendar. The action of the court in placing it on the calendar and continuing it there with knowledge that the transcript had not been filed was an act done under the writ of error and which

prevented it from becoming functus officio. It amounted to an extension of the time for the filing of the transcript. And if it was an extension of time, as no specific time was mentioned, it must be construed as permission to file within a reasonable time, or until the court should withdraw its permission by making an order to that effect. And the transcript was subsequently filed, no order to the contrary ever having been made by the court.

We think that in view of all that has taken place, including the acquiescence and consent of the government up to the time this motion was made, the case should not now be dismissed. The counsel for the government has appeared before the court in this case on numerous occasions with knowledge that the transcript was not filed and without any objection on that account. At the time the case was ordered on the calendar he stated to this court in substance that he had been served with the plaintiff's preliminary brief, that a bound copy of the record had been delivered to the clerk as the court had ordered, that the exhibits had not yet been printed, but that the delay was not due to any fault of the plaintiff's counsel, but was purely due to the extraordinary size of the record. We have no doubt of the truth of the statement, and we are not satisfied that the delays which subsequently occurred were of such a nature as entitle the government to have the case dismissed. The publication of the record was completed within the stipulated time, except volume 10, which contained the exhibits, and the delay in the publication of that volume was due in part to the inability of the counsel on both sides to agree on what exhibits should be included, and because of delay of counsel for the government in furnishing the plaintiff's counsel with the exhibits which were to be printed. Before the volume containing the exhibits was printed, the record could not be certified by the District Judge, and could not be filed in the office of the clerk of this court. During this period an application was made to this court in April, 1914, for a writ of prohibition, to be directed to the District Court, restraining that court from entering an order vacating the judgment of conviction and granting a new trial. Thereupon this court certified certain questions arising upon the application to the United States Supreme Court, which were answered on November 16, 1914. United States v. Mayer, 235 U. S. 55, 35 Sup. Ct. 16, 59 L. Ed. 129 (1914). This no doubt complicated the situation and delayed to some extent the prosecution of the case in this court.

The counsel for the government has not been misled in any stage of these proceedings, has not supposed at any time that the prosecution had been abandoned, had no reason for complaining of unreasonable delay, and any delay which has occurred since the bill of exceptions was, as we hold, validly settled, has not led to the continuance of the case over any term of the court. The motion to dismiss, made under the above circumstances and after $10,000 has been expended in printing the record, and after a delay for which the government's counsel is not free from fault, cannot be granted. This brings us to consider the second objection, that there is no proper bill of exceptions before the court.

[3] It is undoubtedly within the power of a court during the judgment term to enter an order extending the term, and thus take the case out of the operation of the general rule that the power to reduce exceptions to form and have them signed and filed is, under ordinary circumstances, confined to the term at which the judgment is rendered. When a term has been so extended, the Supreme Court has said:

"It may be further extended by another order, made after the expiration of the original limits of the term."

That court has also more than once expressed the opinion that by *consent of the parties* a bill of exceptions might be signed and filed after the term expired. Muller v. Ehlers, 91 U. S. 249, 251, 23 L. Ed. 319 (1875); Michigan Insurance Bank v. Eldred, 143 U. S. 293, 298, 12 Sup. Ct. 450, 36 L. Ed. 162 (1892); Ward v. Cochran, 150 U. S. 597, 14 Sup. Ct. 230, 37 L. Ed. 1195 (1893). And in Jennings v. Philadelphia, Baltimore & Washington R. R. Co., 218 U. S. 255, 257, 31 Sup. Ct. 1, 2, 54 L. Ed. 1031 (1910), the court said:

"So grave a matter as the allowance of a bill of exceptions after the close of the term, and after the court had lost all judicial power over the record, should not rest upon a mere implication from silence. There should be express consent, or conduct which should equitably estop the opposite party from denying that he had consented."

The record in the case at bar discloses that from time to time the court by its orders extended the time to settle the bill of exceptions. The parties by stipulation have also on numerous occasions extended the time. The conduct of the government between the time of the judgment of conviction and the time of the making of the motion to dismiss has been such as makes it inequitable to assert that defendant is in default as to the settlement of the bill of exceptions. The attorney for the United States requested the defendant's counsel not to complete the record for this court until the briefs were printed, and the government's brief was not printed and served on the defense until May 1, 1915. That defendant has proceeded in the matter in good faith is clear, and the unusual delay is accounted for by the extraordinary circumstances which excuse it. The government, through its counsel, has to some extent caused the delay by its own remissness in furnishing exhibits which it desired printed in the record, and it has acquiesced in the delay to a degree which amounts to an implied agreement that the time should be extended.

[4] Moreover, when the court extended the term for five years on the counts upon which sentence was suspended, it had the effect of extending the term on the conviction as a whole, assuming that the court was properly organized and had power to extend the term at all. A conviction of a defendant on various counts does not result in separate judgments, but in a single judgment. Where indictments are consolidated for trial, as was done in this case, the case is the same as one in which the separate offenses are charged in different counts of the same indictment. The statute identifies the two cases. U. S. Comp. St. 1913, § 1690. It is evidently contemplated that, where offenses are grouped and tried together, there shall be but a single judgment. The case is analogous to a civil action in which

a number of causes of action are joined in the same complaint. In such a case there is but a single judgment for the whole amount to which the plaintiff established his right. In People ex rel. Tweed v. Liscomb, 60 N. Y. 559, 575, 19 Am. Rep. 211 (1875), the New York Court of Appeals, in speaking of cases in which it has been held that distinct offenses can be joined in separate counts in the same indictment, said:

"It is safe to say, however, that these cases do not necessarily warrant the conclusion that a conviction for several offenses thus charged is the equivalent of several separate convictions upon distinct indictments as authorizing several distinct judgments."

The court also said:

"Congress has thought it necessary to provide, by statute, for the joinder of several charges against the same person for the same act or transaction, or for two or more acts or transactions of the same class of crimes or offenses in one indictment in several counts, but no provision is made for several judgments on one record."

The doctrine laid down in the Tweed Case that sentences cannot be cumulative is not followed in the federal courts. But the doctrine, which that case also announced, that there can be but one judgment, has not, so far as we are informed, been repudiated by any federal court. That doctrine has been upheld by the Supreme Court in In re Henry, 123 U. S. 372, 375, 8 Sup. Ct. 142, 143 (31 L. Ed. 174) (1887), where Chief Justice Waite said:

"Under the present statute three separate offenses, committed in the same six months, may be joined, but not more, and when joined there is to be a single sentence for all."

This was adhered to in In re De Bara, 179 U. S. 316, 21 Sup. Ct. 110, 45 L. Ed. 207 (1900), and the court held that the court below had the power to give a single sentence for several offenses, in excess of that which the statute prescribed for one offense.

As the defendant has not lost his right to have reviewed that part of the conviction upon which sentence was suspended, it must follow, if the judgment is single, that he has not lost his right to have reviewed that part upon which sentence was imposed. If it were not so, it would result that, if this court dismissed the writ of error as to the counts upon which sentence was imposed, while it sustained the writ of error upon the merits as to the counts upon which sentence was suspended, reversing the judgment of conviction on those counts on the ground that defendant was not tried by a constitutional tribunal, he would enter upon a term of five years' imprisonment under a judgment pronounced by an unconstitutional court, which this court could not review.

The motion to dismiss on the ground that there is no proper bill of exceptions before the court must also, for the reasons above stated, be denied.

[5] This brings us to a consideration of the merits of the case. The most important question presented, and in fact the only remaining question we find it necessary to pass upon, is whether the defendant has been convicted of the crimes for which he was tried in a

manner which the law of the land sanctions. It is claimed on his.
behalf that under the Constitution of the United States a trial by jury
is guaranteed to him, and that he has not had such a trial, because
of the substitution of one judge for another during the trial. The
question is one of great importance. So far as we are informed, the
question has never before been raised in a federal court whether one
judge can be substituted for another in a criminal trial, either with
or without the consent of the accused.

When our forefathers emigrated to this country from England,
they brought with them trial by jury as a defense against the exercise
of arbitrary power. The trial by jury is referred to in Bacon's Abridg-
ment, under the title "Juries," as one of the chief excellencies of the
British Constitution. Like that Constitution the jury seems to have
been a gradual growth and development. It has been denominated
"the favorite child of the English law." The modes of trial of which
Glanvil speaks are the judicial combat, compurgation, and the ordeal
of hot iron, where the suspected person was a freeman, and of water
where he was a "villian." And Forsyth, in his work on Jury Trial,
p. 159, tells us that he finds no trace of anything like a jury impaneled
to try offenders before the time of the Normans.

"Nor for many years after the Conquest," he adds, "do the scanty no-
tices which occur in the old chronicles of persons convicted and punished
for crime furnish a hint of the existence of such a tribunal."

But by the time of the reign of Henry VII, Hallam says:

"The fact of guilt or innocence on a criminal charge was determined in a
public court, and in the county where the offense occurred, by a jury of
twelve men, from whose unanimous verdict no appeal could be made."

The English-speaking peoples the world over have this year com-
memorated the seven hundredth anniversary of the signing of Magna
Charta. That instrument declared that no freeman should be deprived
of life or liberty "but by the judgment of his peers or by- the law
of the land," and this has been expounded as referring to a trial of all
persons by a jury of twelve men, although strictly speaking it is
more likely that it referred to the trial of the barons by their peers.
The Constitution of the United States as originally adopted provides
in the third article as follows:

"The trial of all crimes, except in cases of impeachment, shall be by jury."

The First Congress, however, in September, 1789, proposed to the
Legislatures of the several states ten amendments, which were prompt-
ly ratified. The fifth amendment provides that:

"No person shall be * * * deprived of life, liberty, or property, with-
out due process of law."

The sixth amendment provides that:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy
and public trial, by an impartial jury."

The seventh amendment provides that:

"In suits at common law, where the value in controversy shall exceed twen-
ty dollars, the right of trial by jury shall be preserved."

All the above provisions operate simply as restraints and limitations upon the powers of the government of the United States. But as the state Constitutions also secure to persons accused of crime a right to a trial by jury under provisions more or less similar, the decisions of the state courts, as well as those of the federal courts, may be consulted in seeking to discover the meaning of the constitutional guaranty.

The right to trial by jury has been placed in this country upon what Mr. Justice Story in his Commentaries calls "the high ground of constitutional right," and he declares that the inestimable privilege of trial by jury is conceded by all "to be essential to political and civil liberty." The right is one justly dear to our people, and as a social, political, and judicial institution it is deserving of the solicitude with which it has been regarded by all Anglo-Saxon peoples.

The defendant is accused of a crime for which he is entitled to trial by jury within the meaning of the third article of the Constitution of the United States. The Supreme Court in Callan v. Wilson, 127 U. S. 540, 8 Sup. Ct. 1301, 32 L. Ed. 223 (1888), construed that article as embracing, not only felonies punishable by confinement in the penitentiary, but also some classes of misdemeanors, the punishment of which may involve the deprivation of the liberty of the citizen.

[6] Before going further, it is desirable to consider what "trial by jury" means. While the Constitution of the United States and the Constitutions of the states secure a trial by jury, they do not define its meaning. Lord Hale in his History of the Common Law (Runnington's Ed. 1792) p. 291, calls attention to the fact that one of the excellencies of trial by jury lies in the fact that "the judge is always present at the time of the evidence given in it," and that he is able, "in matters of fact, to give them great light and assistance, by his weighing the evidence before them and observing where the question and knot of the business lies, and by showing them his opinion, even in matters of fact, which is a great advantage and light to laymen." In Hale's Pleas of the Crown, vol. 1, p. 33, it is written:

"The law of England hath afforded the best method of trial, that is possible, of this and all other matters of fact, namely, by jury of twelve men all concurring in the same judgment by testimony of witnesses viva voce in the presence of the judge and jury and by the inspection and direction of the judge."

In Lamb v. Lane, 4 Ohio St. 167, 179 (1854), the court "after a careful examination of the subject" announced that it was clearly of the opinion that the word "jury," where it occurs in the state Constitution, "means a tribunal of twelve men, presided over by a court and hearing the allegations, evidence and arguments of the parties." And the opinion was expressed that twelve men "can never be properly regarded as a jury" unless presided over by a court, and that a "presiding law tribunal is implied, and that the conjunction of the two is the peculiar and valuable feature of the jury trial." The Supreme Court of the United States has expressed the same

Idea. In Capital Traction Co. v. Hof, 174 U. S. 1, 13, 19 Sup. Ct. 580, 585, 43 L. Ed. 873 (1889), the court said:

"'Trial by jury,' in the primary and usual sense of the term at the common law and in the American Constitutions, is not merely a trial by a jury of twelve men before an officer vested with authority to cause them to be summoned and impaneled, to administer oaths to them and to the constable in charge, and to enter judgment and issue execution on their verdict; but it is a trial by jury of twelve men, in the presence and under the superintendence of a judge empowered to instruct them on the law and to advise them on the facts, and (except on acquittal of a criminal charge) to set aside their verdict if in his opinion it is against the law or the evidence. This proposition has been so generally admitted, and so seldom contested, that there has been little occasion for its distinct assertion."

It being settled that the accused is entitled under the Constitution to trial by jury, and that trial by jury involves in the federal courts a trial by twelve men presided over by a judge, it is necessary to consider whether one accused of crime can consent or waive his constitutional rights as to the tribunal by which he is to be tried.

As the Constitution specifically declares that "the trial of all crimes * * * shall be by jury," it is difficult to see how it can be maintained that the trial of a crime in a federal court need not be by jury, provided the accused person consents to be tried in some other manner. The question of how he shall be tried does not seem open to his determination but appears to have been settled for him by the mandatory provision of the Constitution of the United States, however it might be under the Constitution of a state differently worded. It is necessary, too, to have in mind that the trial of one charged with crime affects not merely the rights of the accused but the public interests. As Blackstone expressed it—4 Commentaries, p. 189—"the king has an interest in the preservation of all his subjects." The Declaration of Independence declares that all men are endowed by their creator with certain *inalienable* rights; that among these are life, *liberty*, and the pursuit of happiness. In his great work on Constitutional Limitations, p. 576, Judge Cooley, discussing waiver of rights, said that:

Consent in a criminal case cannot bind the defendant "since criminal charges are not the subject of arbitration, and any infliction of criminal punishment upon an individual, except in pursuance of the law of the land, is a wrong done to the state, whether the individual assented or not."

This is the view taken by the Supreme Court of the United States. In Crain v. United States, 162 U. S. 625, 16 Sup. Ct. 952, 40 L. Ed. 1097 (1896), that court set aside a judgment of conviction of forgery and a sentence of imprisonment for three years because the record did not affirmatively show that the accused had been formally arraigned, or that he pleaded to the indictment, although it showed that the jury had been duly selected, impaneled and sworn "to try the issue joined," and that after hearing the evidence and argument they retired to consider of their verdict, which they subsequently returned into court. The government claimed that it should be assumed that the defendant had pleaded not guilty, and that the failure of the clerk to record the fact was a clerical error, which did not prejudice

substantial rights. Mr. Justice Harlan, writing the opinion of the court, said:

"In Hopt v. Utah, 110 U. S. 574, 579 [4 Sup. Ct. 202, 28 L. Ed. 262], this court, observing that the public has an interest in the life and liberty of an accused person, said: 'Neither can be lawfully taken except in the mode prescribed by law. That which the law makes essential in proceedings involving the deprivation of life or liberty cannot be dispensed with or affected by the consent of the accused, much less by his mere failure, when on trial and in custody, to object to unauthorized methods.'"

And then Justice Harlan added:

"The present defendant may be guilty, and may deserve the full punishment imposed upon him by the sentence of the trial court. But it were better that he should escape altogether than that the court should sustain a judgment of conviction of an infamous crime where the record does not clearly show that there was a valid trial."

In Low v. United States, 169 Fed. 86, 94 C. C. A. 1 (1909), Mr. Justice Lurton said:

"The right to waive a right does not exist when the matter concerns the public as well as the individual. * * * It is not competent for the accused and the district attorney to change by consent the constitution of the tribunal provided for the trial of crimes. Between the waiver of a jury in a civil case and its waiver in a trial for crimes there are fundamental differences. The one involves only property rights of the parties, rights over which they have dominion. The other involves the liberty or life of the citizen. This is a matter over which the accused has not dominion. The state, the public, are concerned that neither shall be affected save by due process of law."

An examination of the provisions in the state Constitutions on the subject of trial by jury shows that there is a very general concurrence in the belief that the public interests require that a person accused of felony shall not have the right to waive a jury trial. No other inference can be drawn from the fact that it is expressly provided in many of them that trial by jury may be waived in a civil case, which necessarily implies that it cannot be waived in a criminal case. Thus the Constitution of New York (1894) provides in article 1, § 2, that trial by jury in all cases shall remain inviolate, "but a jury trial may be waived by the parties in all civil cases in the manner to be prescribed by law." The same provision is found in identical language in the Constitution of 1846. And the Constitution of Pennsylvania provides in article 5, § 27, as follows:

"The parties, by agreement filed, may, in any civil case, dispense with trial by jury, and submit the decision of such case to the court having jurisdiction thereof, and such court shall hear and determine the same; and the judgment thereon shall be subject to a writ of error, as in other cases."

The Constitution of California (1879), article 1, § 7, provides that a trial by jury may be waived in all criminal cases, not amounting to felony, by the consent of both parties expressed in open court. The Constitution of Idaho (1889), article 1, § 7, contains a similar provision. In Vermont the Constitution provides in article 10 that in all prosecutions for criminal offenses a person has a right to a speedy trial by an impartial jury "without the unanimous consent of which jury, he cannot be found guilty." The Constitution of the state of Washington (1889) provides in article 1, § 21:

"The right of trial by jury shall remain inviolate, but the Legislature may provide for a jury of any number less than twelve in courts not of record, and for a verdict by nine or more jurors in civil cases in any court of record, and for waiving of the jury in civil cases where the consent of the parties interested is given thereto."

In the Constitution of Montana (1889) article 3, § 23, it is provided that:

The right of trial by jury shall be secured to all and remain inviolate, "but in all civil cases and in all criminal cases not amounting to felony, upon default of appearance or by consent of the parties expressed in such manner as the law may prescribe, a trial by jury may be waived, or a trial had by any less number of jurors than the number provided by law."

The Constitution of Virginia (1902), article 1, § 8, after providing that in all criminal prosecutions the accused shall be entitled to a speedy trial by an impartial jury of his vicinage, declares that:

"In any criminal case, upon a plea of guilty, tendered in person by the accused, and with the consent of the attorney for the commonwealth, entered of record, the court shall, and in a prosecution for an offense not punishable by death, or confinement in the penitentiary, upon a plea of not guilty, with the consent of the accused, given in person, and of the attorney for the commonwealth, both entered of record, the court, in its discretion, may hear and determine the case, without the intervention of a jury."

While the constitutional provisions of the states have no application to trial in the federal courts for offenses committed against the United States, they are nevertheless interesting as showing the deep-seated conviction of the people of various commonwealths that the life and the liberty of the citizens of this country should be protected by the courts against forfeiture, except in accordance with the established principles of law, which cannot be waived by the voluntary action of the individual.

In connection with this consideration of the provisions as to trial by jury found in the state Constitutions, it may be remarked that there is nothing in the Constitution of the United States which would preclude the abolition by a state of trial by jury. The fourteenth amendment declares that no state shall "deprive any person of life, liberty or property without due process of law." The Supreme Court of the United States in Frank v. Mangum, 237 U. S. 309, 35 Sup. Ct. 582, 59 L. Ed. 969, decided April 19, 1915, said:

"Repeated decisions of this court have put it beyond the range of further debate that the 'due process' clause of the fourteenth amendment has not the effect of imposing upon the states any particular form or mode of procedure, so long as the essential rights of notice and a hearing, or opportunity to be heard, before a competent tribunal are not interfered with. Indictment by grand jury is not essential to due process. Hurtado v. California, 110 U. S. 516, 532, 538 [4 Sup. Ct. 111, 292, 28 L. Ed. 232]; Lem Woon v. Oregon, 229 U. S. 586, 589 [33 Sup. Ct. 783, 57 L. Ed. 1340], and cases cited. Trial by jury is not essential to it, either in civil cases. Walker v. Sauvinet, 92 U. S. 90 [23 L. Ed. 678]. Or in criminal cases. Hallinger v. Davis, 146 U. S. 314, 324 [13 Sup. Ct. 105, 36 L. Ed. 986]; Maxwell v. Dow, 175 U. S. 581, 594, 602, 604 [20 Sup. Ct. 448, 494, 44 L. Ed. 597]."

The language of the Constitution of the United States respecting the right to trial by jury in civil actions, as provided in the seventh amendment, is different from the language used in the third article

respecting the right to trial by jury in criminal cases. The seventh amendment simply declares that "the right of trial by jury shall be *preserved*" in suits at common law. And the Supreme Court has held that the constitutional right to a jury trial in civil cases is a mere privilege, intended solely for the benefit of the parties litigant, and that the right may be waived. In Bank of Columbia v. Okley, 4 Wheat. 235, 4 L. Ed. 559 (1819), the court in holding that in a civil case the right might be waived, said:

"That this view of the subject is giving full effect to the seventh amendment of the Constitution is not only deducible from the general intent, but from the express wording, of the article referred to. Had the terms been, that 'trial by jury shall be preserved,' it might have been contended that they were imperative, and could not be dispensed with. But the words are that 'the right of trial * * * shall be preserved,' which places it on the foot of a lex pro se introducto, and the benefit of it may therefore be relinquished."

And see Citizens' Gaslight Co. v. Wakefield, 161 Mass. 432, 37 N. E. 444, 31 L. R. A. 457; Joy v. Blum, 55 N. J. Law, 518, 26 Atl. 861; Baird v. New York, 74 N. Y. 382; Claussenius v. Claussenius, 179 Ill. 545, 53 N. E. 1006.

It may be conceded, too, that the right to a jury trial may be waived in trials of persons accused of minor offenses. The constitutional provisions do not extend the right to a jury trial. They only secure it in the cases in which it was a matter of right at common law. Cooley on Constitutional Limitations (7th Ed.) p. 590. Thus in Schick v. United States, 195 U. S. 65, 24 Sup. Ct. 826, 49 L. Ed. 99, 1 Ann. Cas. 585 (1904), the Supreme Court held that a written waiver of a jury by a person prosecuted by information for the violation of a revenue statute was not in conflict with the Constitution of the United States, providing that the trial of all crimes shall be by jury. The decision went upon the ground that the constitutional provision did not apply to petty offenses, and, that being the case, no reason existed why the defendant could not waive trial by jury and consent to trial by the court. There have been a number of decisions in the state courts to the same effect. See Brewster v. People, 183 Ill. 143, 55 N. E. 640; Levi v. State, 4 Baxt. (Tenn.) 289; State v. Alderton, 50 W. Va. 101, 40 S. E. 350; Cassidy v. Sullivan, 64 Cal. 266, 28 Pac. 234; Ex parte Wong You Ting, 106 Cal. 296, 39 Pac. 627; Christensen v. Hollingsworth, 6 Idaho, 87, 53 Pac. 211, 96 Am. St. Rep. 256; Finch v. Kent, 24 Mont. 270, 61 Pac. 653.

Judge Thompson, in his work on Trials (section 6), states the rule:

"While in cases of felony the constitutional right to be tried by a jury of twelve men cannot be waived by the accused, in cases of misdemeanor the rule is different, especially where the punishment is a pecuniary fine merely."

In Hopt v. Utah, 110 U. S. 574, 4 Sup. Ct. 202, 28 L. Ed. 262 (1884), it was held that one indicted for felony must be personally present at the trial; it not being within his power or that of his counsel to waive his presence. But in that case the local Code of Criminal Procedure declared:

"If the indictment is for felony the defendant *must* be personally present at the trial."

The judgment was reversed because of the action of the trial court in permitting certain challenges to jurors, based upon the ground of bias, to be tried out of the presence of the court, the defendant, and his counsel. The accused had not objected at the time, and it was subsequently claimed that by his silence he had consented to what was done. As explained in Frank v. Mangum, supra, the ground of the decision was the violation of the plain mandate of the local statute. As the statute of the territory of Utah declared that he "*must* be personally present," his consent that his trial, or any part of it, might go on without his personal presence could not dispense with what the Code made essential. That was the only question involved.

In Diaz v. United States, 223 U. S. 442, 32 Sup. Ct. 250, 56 L. Ed. 500, Ann. Cas. 1913C, 1138 (1912), it was held that the right of one accused of felony to be confronted with the witnesses was one which the accused might waive; and it was also held that one *who was out on bail and not in custody* might waive his right to be present at the trial and leave the court free to proceed in his absence. In the course of its opinion, written by Mr. Justice Van Devanter, the court, in referring to the right of the accused to be present at the trial, said:

"In cases of felony our courts, with substantial accord, have regarded it as extending to every stage of the trial, inclusive of the impaneling of the jury and the reception of the verdict, and as being scarcely less important to the accused than the right of trial itself. And with like accord they have regarded an accused who is in custody and one who is charged with a capital offense as incapable of waiving the right; the one because his presence or absence is not within his own control, and the other because, in addition to being usually in custody, he is deemed to suffer the constraint naturally incident to an apprehension of the awful penalty that would follow conviction. But where the offense is not capital, and the accused is not in custody, the prevailing rule has been that if, after the trial has begun in his presence, he voluntarily absents himself, this does not nullify what has been done or prevent the completion of the trial, but, on the contrary, operates as a waiver of his right to be present, and leaves the court free to proceed with the trial in like manner and with like effect as if he were present."

The language quoted indicates that in cases of felony one *who is in custody is incapable* of waiving the right to be present at the trial. And in Lewis v. United States, 146 U. S. 370, 13 Sup. Ct. 136, 36 L. Ed. 1011 (1892), the court declared:

"A leading principle that pervades the entire law of criminal procedure is that, after indictment found, nothing shall be done in the absence of the prisoner. While this rule has, at times and in the cases of misdemeanors, been somewhat relaxed, yet in felonies it is not in the power of the prisoner, either by himself or his counsel, to waive the right to be personally present during the trial."

In Frank v. Mangum, supra, what was decided was that, inasmuch as a state might, without infringing the fourteenth amendment, abolish trial by jury, it might limit the effect to be given to an error respecting one of the incidents of such trial; that the presence of the prisoner when the verdict was rendered was not so essential a part of the hearing that a rule of practice permitting the accused to waive it and holding him bound by the waiver amounted to a deprivation of "due

process of law." The accused had been tried in a state court of Georgia and convicted of murder. He was not in the courtroom when the verdict was rendered, his presence having been waived by his counsel and the waiver was accepted and acquiesced in by the court.

In West v. State, 42 Fla. 244, 28 South. 430 (1900), the court said:

"The common-law rule is that in a trial for felony, if a juror, the judge, or the prisoner become incapacitated by illness or death, after the jury is impaneled and sworn in chief, the proper course to pursue is to declare a mistrial and begin de novo."

This was not, however, a case where one judge was substituted for another, but where, after a full panel of twelve jurors had been selected and sworn, one juror became ill and was excused, and a new juror took his place. There are a number of cases where an attempt has been made to substitute a juror for one of the twelve who have been impaneled to try the case, and where, owing to sickness or some disqualification, one of the original panel has been excused. The rule seems to be well established in such cases that the trial must begin de novo, in order that the defendant may have his full right of challenge, and in order that the new juryman may both see and hear all the witnesses. See The Queen v. Ashe, 1 Cox, C. C. 150 (1845); Dennis v. Mississippi, 96 Miss. 96, 50 South. 499, 25 L. R. A. (N. S.) 36 (1909); State v. Vaughan, 23 Nev. 103, 43 Pac. 193 (1896); State v. Davis, 31 W. Va. 390, 7 S. E. 24 (1888); Cobb v. State, 45 Ga. 11 (1872); Grable v. State, 2 G. Greene (Iowa) 559 (1848); People v. Stewart, 64 Cal. 60, 28 Pac. 112 (1883).

In Cancemi v. People, 18 N. Y. 128 (1858), a leading case on this subject, a juror was withdrawn in pursuance of a stipulation signed by the accused and filed in open court that a verdict might be rendered by eleven jurors and that "the twelve names now appearing of record as the jury in this cause may remain, so that by the record this cause shall appear to have been tried by twelve jurors." The court held this invalidated the trial; the consent of the prisoner being a nullity and the conviction illegal. The court referred to the fact that the state had an interest in the preservation of the liberties and the lives of its citizens and that as a criminal prosecution may result in a forfeiture of the life or the liberty of the accused the consent of the latter "should not be permitted to extend so far as to work radical changes in great and leading provisions as to the organization of the tribunals or the mode of proceeding prescribed by the Constitution and the laws." The opinion points out that consent may in many particulars affect the proceedings; that objections to jurors may be waived; that the court may be substituted for triers to dispose of challenges to jurors; that secondary evidence may be received in place of primary evidence; that admissions of facts may be allowed. "But, when issue is joined upon an indictment, the trial must be by the tribunal and in the mode which the Constitution and laws provide, without any essential change. The public officer prosecuting for the people has no authority to consent to such a change nor has the defendant.

In State v. Kaufman, 51 Iowa, 578, 2 N. W. 275, 33 Am. Rep. 148 (1879), the defendant was indicted for uttering and publishing a

forged promissory note with intent to defraud. One of the jurors during the trial was taken ill, and with the consent of the defendant was discharged, and the trial resumed before eleven jurors. A verdict of guilty was rendered, and then defendant, on the ground that no legal judgment could be rendered on such a verdict, moved in arrest of judgment. The Supreme Court upheld the judgment, and held that one accused of crime could waive the constitutional right to a trial by a jury of twelve men. · In the course of its opinion the court said that a conviction could only be legally obtained in a criminal action upon competent evidence, but, if the accused failed at the proper time to object to such as was incompetent, he waived his right to do so. He had, said the court, a constitutional right to a speedy trial, but he could waive it by obtaining a continuance. ·It added:

"A plea of guilty ordinarily dispenses with a jury trial, and it is thereby waived. This, it seems to us, effectually destroys the force of the thought that 'the state, the public, have an interest in the preservation of the lives and the liberties of the citizens, and will not allow them to be taken away without due process of law.' * * * The defendant may have consented to be tried by eleven jurors, because his witnesses were then present, and he might not be able to get them again, or that it was best he should be tried by the jury as thus constituted. Why should he not be permitted to do so? Why hamper him in this respect? Why restrain his liberty or right to do as he believed to be for his interest? * * * We, however, may remark, without committing ourselves thereto, that it is difficult to see why a defendant may not, with the consent of the court and state, elect to be tried by the court."

The language of the Iowa Constitution (article 1, § 9) was:

"The right of trial by jury shall remain inviolate, * * * but no person shall be deprived of life, liberty, or property, without due process of law."

It will be observed that this language differs materially from that used in the Constitution of the United States.

The Supreme Court of the United States held, in Thompson v. Utah, 170 U. S. 343, 18 Sup. Ct. 620, 42 L. Ed. 1061 (1898), that one charged with the crime of grand larceny cannot waive his right to be tried by a jury of less than twelve men. The jury referred to in the original Constitution and in the sixth amendment is a jury constituted as it was at common law, of twelve persons, neither more nor less. The court in its opinion said:

"It is said that the accused did not object, until after verdict, to a trial jury composed of eight persons, and therefore he should not be heard to say that his trial by such a jury was in violation of his constitutional rights. It is sufficient to say that it was not in the power of one accused of felony, by consent expressly given or by his silence, to authorize a jury of only eight persons to pass upon the question of his guilt. * * * If one under trial for a felony the punishment of which is confinement in a penitentiary could not legally consent that the trial proceed in his absence, still less could he assent to be deprived of his liberty by a tribunal not authorized by law to determine his guilt."

It has been held, too, in·a number of cases, that in a criminal case the accused cannot consent to waive the jury and be tried by the court. Williams v. State, 12 Ohio St. 622 (1861); Bond v. State, 17 Ark. 290 (1856); People v. Smith, 9 Mich. 193 (1861); League v. State, 36 Md. 257 (1872).

In State v. Worden, 46 Conn. 349, 33 Am. Rep. 27 (1878), however, the court sustained the constitutionality of a statute which provided that in all prosecutions the party accused, if he should so elect, might be tried by the court instead of by the jury. The Constitution of the state provided that every person accused should "have a speedy public trial by an impartial jury" and also that "the right of trial by jury shall remain inviolate." The prisoner was indicted, tried, and convicted of the crime of rape upon a child under ten years of age. The prisoner requested to be tried by the court, and after conviction moved in arrest of judgment the unconstitutionality of the statute. It was urged on his behalf that the right of an individual to a trial by jury was so interwoven with the interest of the body politic that its surrender was placed beyond the power of the individual. The court thought the particular constitutional provision referred to was "apparently designed to secure personal rights of individuals." And the court attached importance to the phraseology of the clause in the state Constitution as compared with that used in the Constitution of the United States, implying that a different conclusion might have been reached, had the language been such as was used in the federal Constitution.

"We find," said the court, "in the Constitution of the United States, which was in force when our Constitution was framed, the explicit provision: 'The trial of all crimes, except in cases of impeachment, shall be by jury.' It would have been easy for our convention to be equally explicit. The fact that the interests of the public in this regard were not expressly provided for furnishes a strong presumption that it was not intended to place the matter beyond legislative control. With the Constitution of the United States before the convention, the omission is significant."

And on the point that it was contrary to the public interest to allow a waiver of a jury trial in a criminal case the court said:

"We cannot believe that it is wise or expedient to place the life or liberty of any person accused of crime, even by his own consent, at the disposal of any one man or two men, so long as man is a fallible being. * * * We are dealing, not with a question of expediency, but with one of constitutional power. The judiciary has power to declare a statute void for unconstitutionality, and will exercise that power only in clear cases. But we know of no principle of jurisprudence that will justify the court in avoiding a statute on the ground that it is contrary to sound policy. Such a decision would manifestly be an encroachment upon the domain of legislation."

We come now to consider the cases in which a substitution of judges has been made in the course of a criminal trial. In Blend v. People, 41 N. Y. 604 (1870), the accused was indicted for false pretenses. The trial began before the county judge and two justices of the Court of Sessions. In the second day of the trial it was found that one of the justices had left the court and gone to his home. Thereupon another justice qualified to act was called in to fill the vacancy. The record disclosed that:

"No question of any kind was presented to or decided by the court, either for or against the accused, from the time Justice Davidson took his seat until after the jury rendered their verdict."

The Court of Appeals reversed the judgment and ordered a new trial.

"This is not the case," said the court, "where a member of the court leaves the bench for a few moments, intending to return, and does return, but a total abandonment of the trial, in consequence of which one-third of the court is changed; and it is not for us to speculate in regard to the probable injury which might result from the substitution of Davidson. It is sufficient that the prisoner had a right to insist that his trial should proceed before the same court before which it was commenced."

In People v. Shaw, 63 N. Y. 36 (1875), the accused was tried and convicted under the following circumstances: At the beginning of the trial the court was composed of three judges; after the trial had progressed several days, one of the judges absented himself from the court for an entire day, during which the trial proceeded and evidence was taken; he returned the next day and took part in the subsequent proceedings. The counsel for the prisoner, before sentence, moved in arrest of judgment on the ground that no legal court was present to receive the verdict. The Court of Appeals unanimously sustained the point. The court declared that the two judges who were present throughout the trial constituted a competent court, and that there would have been no difficulty, had the third judge not returned and taken part in the subsequent proceedings. The absence of the third judge during a material part of the trial disqualified him from further sitting as a member of the court on that trial. The General Term in its opinion (3 Hun [N. Y.] 272) declared that:

"Where life is involved, the law humanely provides that the prisoner stands upon all his rights, and does not and cannot waive them."

And that:

"The participation of Justice Steere in the trial after his absence from the courthouse, while the whole of Monday's evidence was given, was against the provision of the law and Constitution giving a jury trial before a regularly constituted court, the members of which should hear all the evidence and proceedings. It certainly is against public policy to allow a party to be deprived of his life by a tribunal, of which it can be said, that a portion thereof has not heard the whole evidence and proceedings which result in the sentence of death."

In Hinman v. People, 13 Hun (N. Y.) 266 (1878), the accused had been indicted for grand larceny. He was tried before a court composed of three judges. At the time the jury rendered their verdict only one of the judges was on the bench. One of the two other judges had left the building and the other was in the lower hall. The jury was polled at the request of the counsel for the accused and the verdict was entered on the docket. The court unanimously held that the conviction must be reversed, because when the verdict was received the court was improperly constituted. It was said:

"Receiving the verdict was one, if not the most important, of the proceedings during the trial. It must be received by the court before which the trial was had, and if not the verdict is a nullity, and not authority for the sentence."

In People v. McPherson, 74 Hun, 336, 26 N. Y. Supp. 236 (1893), the accused was charged with petit larceny. A substitution of judges was made after the jury had been selected, the case opened upon the part of the people, and a motion to dismiss had been made on behalf

of defendant at the conclusion of the opening. The Supreme Court declared, through Judge Herrick, that these proceedings "were very important parts of the trial, just as much so as any of the subsequent proceedings." And he added:

"The proposition that a criminal case cannot be partly tried before one magistrate and partly before another seems to me too clear to need argument or citation of authority to sustain it. When the trial of a case is once commenced, it must proceed to the end before the same court and jury."

In Durden v. People, 192 Ill. 493, 61 N. E. 317, 55 L. R. A. 240 (1901), it was held that a prisoner on trial for his life was entitled to the judgment of the judge who had heard the evidence and conducted the trial, and that it was reversible error for the judge who had heard the evidence and part of the argument to leave the bench and substitute another judge of the same circuit, who had not heard the evidence, to hear the remaining argument, give the instructions, and receive the verdict. The substituted judge read to the jury all the instructions given for the defendant. These had been prepared by the judge who retired, but the substituted judge gave all the instructions for the state. The Supreme Court said:

"We think that the plaintiff in error had a right to insist that his trial should proceed before the same judge before whom it was commenced. It is not sufficient that the court or the tribunal was the same by the substitution of another judge of equal power."

And:

"Here, the trial was conducted by two judges, one succeeding the other, and here also, as was the case in Shaw v. People, supra, it is against public policy to allow this plaintiff in error to be deprived of his life by a tribunal, of which one of the sitting judges did not hear the whole evidence and proceedings resulting in the sentence of death against him."

In People v. Henderson, 28 Cal. 465 (1865), the defendant was indicted, tried, and convicted of murder. A substitution of judges took place under the following circumstances: At the close of the testimony the trial judge was informed by telegraph that his presence was immediately required at his home in consequence of the dangerous illness of his family. It was thereupon agreed by all parties, the accused consenting, that the judge of another district might sit during the remainder of the trial. In pursuance of this agreement the judge of the other district appeared at the hour appointed for the opening of the court on the following day and presided till the conclusion of the trial and the rendition of the verdict. He heard the argument, charged the jury, and received the verdict. After the verdict the first judge resumed his seat on the bench and over the objection of the accused pronounced the sentence. The accused claimed in the Supreme Court that it was error for the second judge to be called in after the trial had commenced, and that the accused's consent to the proceeding was without effect. It was also claimed that after the first judge withdrew from the trial it was error for him to resume the bench after the verdict was received, and that he could not impose the sentence. The court overruled both claims and affirmed the judgment. In its opinion the court said that the charge given by the

substitute judge was manifestly adapted to the evidence in the case and "was probably written by the retiring judge." It added:

"Although it is desirable that the same judge who commences the trial should sit until it is completed—and in many cases, doubtless, it would be impracticable to do otherwise—yet, in some instances, as in this, there may be no inconvenience resulting from the taking up of the case by another judge after the testimony closes. And if the parties interested consent to such a course of proceeding, we can see no objection to it. The parties interested are in a condition to judge whether the circumstances of the case are such that they are liable to be affected unfavorably by the change. After deliberately consenting to such a change, and taking the chances of a successful issue, and losing, they cannot be permitted to repudiate the proceedings and avail themselves of the chances of a more favorable result on a second trial."

In People v. Casselman, 10 Cal. App. 234, 101 Pac. 693 (1909), the Court of Appeal for the Second District held that changes in the personnel of several judges presiding at different times during the trial of a defendant accused of forgery did not affect the jurisdiction of the court. It was also held that, in the absence of any showing to the contrary, it must be presumed upon appeal that such changes were for good reasons and were not prejudicially erroneous. It not appearing that defendant objected, it was held that she must be presumed to have assented and to have waived any possible objection. The Supreme Court was asked to grant a rehearing and refused. 10 Cal. App. 234, 101 Pac. 693.

In People v. Hobson, 17 Cal. 429 (1861), the court held, where the judges composing the court of sessions, on motion for a new trial, were not the same judges who composed the court during the trial, one member being different, that defendant, not having objected at the time, waived the objection.

"We think," the court said, "that the ends of justice might generally be better subserved if all the members of the court who heard the case on the trial should sit on the motion for a new trial; but this is not a statutory right or obligation, and it would be going too far if we were to avoid the action of a court legally constituted, and having full jurisdiction of the subject, merely upon the suggestion that it was not so constituted as to the particular members as more probably to insure an intelligent and satisfactory decision. Cases might arise where this point alone, or in connection with other matters, would entitle a party to a new trial, or to a hearing of his motion before the justices presiding on the trial; but in the absence of a showing of some special cause, we think this single circumstance does not constitute a ground of reversal of the judgment."

Mr. Justice Field of the Supreme Court of the United States was at the time the Chief Justice of the California Supreme Court and concurred in the opinion.

The power of a judge to decide a motion for a new trial where the original trial was had before another judge is an entirely different question from the one involved in the case at bar. On that question the Supreme Court of Illinois, in People v. McConnell, 155 Ill. 192, 40 N. E. 608 (1895), sustained the right of a judge to decide a motion for a new trial, where the judge who tried the case died after the verdict, although the same court held it reversible error, as we have seen, to substitute one judge for another during the trial. Durden v. People, supra.

In his great work on Criminal Law Mr. Chitty declares that justices of oyer and terminer, gaol delivery, and of the peace, had power to give judgment by virtue of their respective commissions, but that at common law, by granting a new commission, all the proceedings taken before the former commissioners expired, and therefore, if from any cause a prisoner had been convicted, but judgment delayed or sentenced, and no execution awarded, before former commissioners, no judgment could be given or execution ordered by their successors.

"And," he adds, "there was some reason for this restriction; for the subsequent judges were unacquainted with the circumstances of the case as developed on the trial, and might therefore unconsciously be the occasion of injustice."

But the rule was abolished by St. 11 Henry VI, c. 6, as to justices of the peace, and by St. Edward VI, c. 7, as respected the judges of gaol delivery and oyer and terminer. Chitty's Criminal Law (Ed. of 1816) vol. 1, p. 697. In Charles v. State, 4 Port. (Ala.) 108 (1836), the plaintiff in error, who was a slave, had been found guilty of murder. The judge who presided at the trial died before sentence was imposed. At the next term of court a motion was made for the discharge of the prisoner on the ground that, as a different judge was presiding in the court, there was no power to give a judgment which ought to have been rendered in the preceding term. The Supreme Court thought otherwise, and affirmed the judgment, and said the power to give judgment resided in the court and was derived from the Constitution, and did not depend upon the commission of a particular judge. The court, however, concluded its opinion with the following statement:

"In cases like this, in which the judge who presided at the trial had power to grant a new trial on his own observation of any impropriety in the conduct of the witnesses, or because he did not believe them, it would, perhaps, be most proper for the court to grant a new trial, unless it appeared by evidence, from some source, that the judge before whom the cause was tried was satisfied with the verdict."

In Pegalow v. State, 20 Wis. 61 (1865), it was held that a judge might sentence a prisoner convicted before his predecessor in office. The court points out the fact that in this case the statute fixed the penalty for the crime, leaving nothing to the discretion of the court. And it concludes its opinion as follows:

"Where a discretion was given, there might be some reason for saying that the judge who pronounced the sentence should be acquainted with the circumstances of the case as disclosed at the trial, in order to award the proper degree of punishment. But no such reason can apply here."

And there seems to be considerable authority for saying that, where the jurisdiction of the court is not lost, the judge sitting at a regular term thereof may pass sentence, although the conviction was had at another term and before another judge. See 12 Cyc. 769; Clanton v. State, 96 Ala. 111, 11 South. 299; Lamphere v. State, 114 Wis. 193, 89 N. W. 128; People v. Reilly, 53 Mich. 260, 18 N. W. 849; People v. Felix, 45 Cal. 163; Ledgerwood v. State, 134 Ind. 81, 33 N. E. 631. But in United States v. Harding, 1 Wall. Jr. 127 Fed. Cas. No. 15,301

(1846), the Circuit Court of the United States for the Third Circuit held that it would not impose sentence on a verdict, inasmuch as the judges who then composed the court had all been commissioned subsequently to the verdict; the former judges having died pending a motion for a new trial. In McKeeney v. Wood, 108 Me. 335, 80 Atl. 837, a judge who heard a cause in equity died. Before his death he made an unsigned statement of his findings of fact and rulings thereon, and added a clause, "A final decree to be signed accordingly." But he died without signing the decree. After his death another judge of the same court entered up a decree, basing it upon the memorandum left by his predecessor. The Supreme Court held this to be error. In the course of the opinion the court said:

"The conclusions of the justice hearing the cause may depend, and frequently do depend, not only upon the words of the witness, but upon his manner. The words can be reproduced afterwards; the manner cannot. As was said in Young v. Witham, 75 Me. 536: 'When the testimony is conflicting, the judge has an opportunity to form an opinion of the credibility of witnesses not afforded to the full court. Often there are things passing before the eye of a trial judge that are not capable of being preserved in the record. A witness may appear badly on the stand and well in the record.'"

This language is directly applicable to the substituted judge in the case at bar, whose knowledge of the credibility of a large number of the witnesses was based solely on what he found in the record.

An examination of the cases in the English courts discloses no warrant for believing that such a substitution of judges as took place in the trial of this defendant would be sustained in that country without a trial de novo. The courts of England jealously guard the life and liberty of the subject, and deny to one accused of crime the power to waive the rights which the law secures to persons so situated, and which are given not alone for their protection, but in the public interest. In Sir John Kelyng's Reports of Crown Cases, p. 56, is an account of Lord Dacre's Case, who was tried for treason in 26 Henry VIII. The statement is:

"And the day before all the Judges assembled to resolve certain questions which might arise upon said Tryal, so that if any Question should be asked them, they might resolve una voce and one Question was, whether the Prisoner might waive his Tryal by his Peers, and be tried by the Country; and they all agreed he could not. For the Statute of Magna Charta is in the Negative, Nec super eum ibimus nisi per legale judicium parium fuorum, this is at the King's Suit upon an indictment."

The same was again resolved on the arraignment of Lord Audley in the seventh year of the reign of Charles I; the reason being that that mode of trial was not so properly a privilege of the nobility as that it is a part of the indispensable law of the land like the trial of commoners by commoners. See Woodson's Lectures, vol. 1, 364. And in Coke's Institutes, vol. 3, p. 30, it is said:

"A noble man cannot waive his triall by his peers and put himself upon the triall of the country, that is of twelve freeholders; for the statute of Magna Charta is that he must be tried per pares. And so it was resolved in the Lord Dacre's Case."

In Rex v. Pinney, 5 Car. & P. 254 (1832) the mayor of Bristol was placed on trial upon an information for a neglect of duty in the pre-

vention of a riot and the suppression of a mob. The trial occupied seven days. During the first three days Lord Tenterden was present, but on the remaining days was prevented by illness from being present. The other justices went on with the trial, and the case having been submitted to the jury a verdict of not guilty was returned. The report of the case simply mentions the absence of Lord Tenterden, and it does not appear that any objection was made to going on without him. The case never got beyond the trial court. It is to be observed that no substitution of a new judge was made, that in the absence of a constitutional or statutory provision to the contrary a majority of the judges is a quorum and is sufficient for the transaction of the business of the court, and that the judges present when the verdict was returned had been present throughout the whole of the trial.

In The Queen v. O'Connell, 1 Cox, Cr. Cases, 365, 401, 418 (1843), one of the famous criminal cases of the last century, Mr. Justice Burton, one of the three trial judges, was prevented by illness from being present at the trial, and counsel for the traversers applied for a postponement and objected to proceeding in the absence of one of the justices. The objection was overruled, and the Attorney General was directed to proceed. The case was carried to the House of Lords, 11 Cl. & F. App. Cas. 231, 232 (1844), but counsel there made no reference to the fact that after Justice Burton retired the trial went on without the presence of the full bench. The explanation of the failure to raise the objection must have been due to the fact that no substitution of judges occurred and that a majority of the judges continued present throughout the entire trial.

In 1870, in Reg. v. Jeffreys, 22 Law Times (N. S.) 786, the hearing was before three justices, one of whom was not present until after three of the witnesses had given their evidence, but when he took his place on the bench the evidence which had previously been given was read over to him openly and aloud. Two other witnesses were then examined. One of the three justices then retired, and the decision was given by the other two, one of the two being the justice who took his place after three of the witnesses had given their testimony. The case was a summary hearing of an order to adjudge that the defendant was the father of an illegitimate child, and the hearing was without a jury. The justice made an order of affiliation, and the matter was carried to the Queen's Bench for the purpose of quashing it on the ground that the justices who made the order had not heard the whole of the case. Mellor, J., stated his opinion that:

"Mr. Perkins"—the justice who came late into the case—"either should not have joined in hearing the case, or they should have resworn the witnesses who were examined before his entrance."

Blackburn, J., said:

"No doubt where magistrates have to decide on evidence with respect to a bastardy order, or any other case, it is their duty to hear the evidence, and if they have decided without hearing it an objection to their order may on that ground be sustained."

The court, however, held that under the circumstances, the attorney for the defendant not having objected, he was precluded from after-

wards raising objection. The case is important as showing that in the opinion of the court a judge should see and hear the witnesses give their testimony, and that it is not sufficient that he should hear the evidence read to him. The fact that the court thought that the right to object· had been waived is in our opinion to be explained by the nature of the proceeding, which, as already mentioned, was of a summary character and without a jury. It does not at all follow that the principle of waiver would be recognized in a case which involved the life or the liberty of an accused person.

In Regina v. Bertrand, L. R. 1 P. C. 520, 534 (1867), a person was tried for a felony in New South Wales, and the jury, not agreeing, were discharged, and a new trial had. On the second trial some of the witnesses at the first trial were resworn, and the evidence given by them at the first trial was read over to them in the presence of the jury and the defendant; liberty being given both to the prosecution and to the defendant to examine and cross-examine. The defendant, having been convicted, carried the case to the Privy Council. He had not objected at ·the time to the course which had been adopted at the trial. The Privy Council sustained the appeal. In his opinion Sir John Coleridge said:

"Their lordships have no doubt that the whole proceeding was conducted by the able and learned judge who presided with due care for the interests of justice on both sides. In nothing that their lordships shall say do they intend to make the slightest reflection on him nor are they in a condition to say that any injustice to the prisoner resulted from it. Yet it is one of the inconveniences of such a course, that no one in their lordships' position, and called to review the proceeding could be sure of the contrary. It is a mistake, moreover to consider the question only with reference to the prisoner. The object of a trial is the administration of justice in a course as free from doubt or chance of miscarriage as merely human administration of it can be—not the interests of either party. This remark very much lessens the importance of a prisoner's consent, even when he is advised by counsel, and substantially, not, of course, literally, affirms the wisdom of the common understanding in the profession, that a prisoner can consent to nothing. For thus it will be seen that a most important consideration is forgotten— that of the jury charged with deciding on the effect of the evidence. It is essential that no unnecessary difficulty should be thrown in the way of their understanding and rightly appreciating it. The evidence in this case, taken in the usual way on the former trial, had occupied nearly three days. Those of their lordships who have been used, on motions for new trials, to hear the judge's notes of the evidence read, probably know well by experience how difficult it is to sustain the attention, or collect the value of particular parts, when that evidence is long; and one cannot but feel how much more this difficulty must press upon twelve men of the ordinary rank, intelligence and experience of common jurymen. But this is far from all. The most careful note must often fail to convey the evidence fully in some of its most important elements—those for which the open oral examination of the witness in presence of prisoner, judge and jury, is justly prized. It cannot give the look or manner of the witness; his hesitation, his doubts, his variations of language, his confidence or precipitancy, his calmness or consideration; it cannot give the manner of the prisoner, when that has been .important, upon the statement of anything of particular moment; nor could the judge properly take on him to supply any of these defects, who, indeed, will not necessarily be the same on both trials; it is, in short, or it may be, the dead body of the evidence, without its spirit, which is supplied, when given openly· and orally, by the ear and eye of those who receive it."

It is not questioned that it is the duty of a trial judge to be present during all the stages of a criminal trial. His absence during the examination of a witness, during the argument of counsel, or at the handing in of a verdict, has been held to constitute reversible error. See People v. Blackman, 127 Cal. 248, 59 Pac. 573; Thompson v. People, 144 Ill. 378, 32 N. E. 968; Ellerbe v. State, 75 Miss. 522, 22 South. 950, 41 L. R. A. 569. And where a statute required the presence of two or more judges at the trial it has been held, as we have seen, that the absence of one of them when the verdict was received invalidated the verdict. Hinman v. People, supra. In the case at bar a judge was present at all the stages of the trial of the defendant. But the judge who thus attended was not the same throughout the trial. Can one judge hear the witnesses for the state and another judge by consent hear the witnesses for the defense? And can a judge, who has not seen and heard all the witnesses seen and heard by the jury, charge the jury, and receive the verdict, and impose sentence if the accused has consented to his substitution in place of a judge who began the trial, but has been compelled by illness to retire?

In the case at bar the substituted judge came into the trial after the government had presented the whole of its case. There were 106 witnesses who testified for the government, and the substituted judge knew nothing of these witnesses, except as he read their testimony in the stenographer's minutes. A trial judge should have before him all the evidence that is before the jury, and he does not have it all before him if the jury has seen and heard the witnesses give their testimony upon the stand, while he has only read it as recorded in the minutes. Witnesses seen and heard by the jury must be seen and heard by the judge.

From the personal appearance of witnesses upon the stand the jury obtained, and the judge did not, what Professor Wigmore calls "the elusive and uncommunicable evidence of a witness' deportment while testifying." Wigmore's Evidence, § 1395. The demeanor of a witness on the stand may be as important as any other evidence in the case. The record of this case affords more than one instance where the judge frankly stated his embarrassment, due to the fact that he had not heard and seen all the witnesses, and so was unable to rule and to instruct the jury as he otherwise might have done. One of the several instances of this sort is seen in the following statement made in the course of his charge to the jury:

"Now, I do not propose to comment upon the testimony of individual human beings in this case, and under the circumstances it would be a piece of judicial impertinence, because you have seen all the witnesses, and I have only seen some of them."

It is the opinion of this court that in a criminal case trial by jury means trial by a tribunal consisting of at least one judge and twelve jurors, all of whom must remain identical from the beginning to the end. It is not possible for either the government or the accused, or for both, to consent to a substitution either of one judge for another judge, or of one juror for another juror. The continuous presence

of the same judge and jury is equally essential throughout the whole of the trial.

The conclusion which we have reached makes unnecessary the consideration of other assignments of error.

Judge WARD, not otherwise dissenting, thinks the motion to dismiss the writ of error should be granted.

Judgment is reversed, and a new trial is ordered.

---

⬤⟲For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes