Gary James EAGAN, Appellant (Defendant Below),

v.

STATE of Indiana, Appellee (Plaintiff Below).

No. 284S45.

Supreme Court of Indiana.

Aug. 2, 1985.

Dennis J. Stanton, Crown Point, for appellant.

Linley E. Pearson, Atty. Gen., Theodore E. Hansen, Deputy Atty. Gen., Indianapolis, for appellee.

PRENTICE, Justice.

Defendant (Appellant) presents this direct appeal from his conviction following a jury trial of attempted murder, Ind.Code §§ 35–42–1–1, 35–41–5–1 (Burns 1979 Repl.). He was sentenced to thirty-five (35) years imprisonment.

We restate Defendant's contentions as the following three issues:

(1) Whether the trial court erred in admitting Defendant's two custodial statements into evidence, and in admitting evidence police officers discovered, with De-

fendant's assistance, after the statements were made.

(2) Whether the trial court erred in failing to give an instruction, *sua sponte*, concerning attempted voluntary manslaughter as a lesser included offense, and erred in giving the court's Final Instruction No. 12, concerning the defense of voluntary intoxication.

(3) Whether a new trial is required because the trial judge, after instructing the jury, left the proceedings in charge of a judge *pro tempore* who performed no judicial act except to receive the jury's verdict. We find no reversible error and affirm the judgment below.

Although the evidence sharply conflicted in certain details, the record demonstrates that Defendant and several companions were driving through south Chicago and offered the victim a ride during the late evening hours May 16, 1982. Eventually Defendant, his companions and the victim joined a larger group of men, drove into Indiana and parked along the Lake Michigan shoreline. There the victim, either for payment or under coercion, engaged in sexual activities with at least several members of the group.

Defendant, his companions and the victim then separated from the larger group, and returned to the same area along the shoreline a short time later. Defendant and his companions apparently desired to continue their sexual activities with the victim, but, for reasons which are not clear from the record, she refused. A struggle ensued which ended with the Defendant stabbing the victim about nine times, then leaving her on the shore.

Defendant and his companions drove back to Chicago and stopped at his sister's home; then Defendant proceeded to his own apartment and called a Chicago police officer whom he knew. Defendant led Chicago police to the victim, who immediately asked the Defendant why he had stabbed her.

After determining that the incident had occurred in Indiana, Hammond police offi-cers interviewed the Defendant the next day. He gave a statement admitting that he had been with the victim near the scene of her attack, but claimed that she had been attacked by a group of men who also had attacked the Defendant. After further investigation, Hammond police obtained a second statement from Defendant in which he admitted stabbing the victim. Several days later Defendant assisted police in locating a knife and other items he had thrown into Lake Michigan after the stabbing.

Other relevant facts are stated below.

## ISSUE I

Defendant claims that the trial court committed reversible error in admitting into evidence his two statements made while in custody of police officers, and in admitting a knife and other items of physical evidence that Defendant assisted police officers to locate, after he had made these statements.

Specifically, Defendant contends that, prior to giving his first statement, he was not adequately advised that if he wished to consult with counsel prior to or during interrogation but could not afford a lawyer, one would be provided for him. He argues that the first advisement of rights given by police officers indicated only that Defendant would be provided with counsel during court appearances. Although Defendant's brief appears to concede that the advisements given before the second statement were adequate, he claims that the second statement was so tainted by the first statement that neither should have been admitted. He further argues that the trial court should not have admitted various items of physical evidence that Defendant had helped police to find in Lake Michigan several days after his second statement, during which Defendant had told the officers he had thrown his knife and other items into the lake. We reject these contentions.

Before a confession may be admitted into evidence, the State must establish beyond a reasonable doubt that the suspect intelligently and knowingly waived

his rights not to incriminate himself and to have an attorney present. *See, Chamness v. State* (1982), Ind., 431 N.E.2d 474, 476; *see generally, Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. However, this Court will not reweigh the evidence in evaluating a trial court's decision to admit a confession, but will only determine whether the record includes sufficient evidence to sustain the trial court's ruling that the confession was voluntarily made. *See, e.g., Ortiz v. State* (1976), 265 Ind. 549, 553, 356 N.E.2d 1188, 1191 and authorities cited.

Prior to taking Defendant's first statement police officers read to Defendant, and had him read and sign, a waiver of rights form which included the following advisements:

## "YOUR RIGHTS

Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning. You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court. If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you talk to a lawyer."

The record contains no indication that Defendant questioned the officers or expressed any confusion concerning the content of these advisements, nor any indication that Defendant requested an attorney before or during his statement. Defendant's first statement claimed that the victim, after spending part of the evening with Defendant, had gone with other persons in a van to the Lake Michigan shoreline while Defendant followed at a distance, that the persons in the van had then approached Defendant, told him they had "dropped off" the victim, and that they then beat him. Thus, outside of Defendant's having admitted that he was with the victim the evening of the crime near the crime scene, facts which he had already reported to police officers before they took him into custody, Defendant's first statement contained nothing implicating himself in the attack upon her.

Following further investigation, police officers asked Defendant to make a second statement one day later, and he agreed. Prior to taking the second statement, police read to Defendant and had him read and sign a waiver form which included the following advisements:

"1. Before making this statement, I was advised that I have the right to remain silent and that anything I might say may or will be used against me in a court of law.

"2. That I have the right to consult with an attorney of my own choice before saying anything, and that an attorney may be present while I am making any statement or throughout the course of any conversation with any police officer if I so choose.

"3. That I can stop and request an attorney at any time during the course of the taking of any statement or during the course of any such conversation.

"4. That in the course of any conversation I can refuse to answer any further questions and remain silent, thereby terminating the conversation.

"5. That if I cannot hire an attorney, one will be provided for me."

Defendant then, in his second statement, admitted that he had stabbed the victim. He also told the officers he had discarded a knife and other items in the lake. He later led police officers along the shoreline to where he had discarded the items, and police divers recovered them.

Defendant argues that the first waiver form indicated that he could be provided with counsel only at some future point, i.e. during court hearings. He cites *California v. Prysock* (1981), 453 U.S. 355, 101

S.Ct. 2806, 69 L.Ed.2d 696, to support his position. While *Prysock* does support the proposition that a suspect must be clearly told that counsel will be provided during interrogation, the opinion does not otherwise support Defendant's position here regarding his first statement. The *Prysock* Court found that the interrogating officer's specific statements to a juvenile suspect and his parents satisfied *Miranda* requirements.

This Court's prior decisions in *Dickerson v. State* (1972), 257 Ind. 562, 276 N.E.2d 845, cited by Defendant, and *Goodloe v. State* (1969), 253 Ind. 270, 252 N.E.2d 788, are distinguishable. In *Dickerson* a suspect was presented with a waiver form very similar to the form used before Defendant's first statement in this case, but the officers did not make sure that the defendant could read the form, nor did they read and explain the form to him. *Id.,* 257 Ind. at 567–72, 276 N.E.2d at 848–51. Although we determined that the defendant was not given adequate *Miranda* warnings, the error was deemed harmless in light of the overwhelming evidence of the defendant's guilt. *Id.,* 257 Ind. at 572–74, 276 N.E.2d at 851. In *Goodloe* the arresting officer's advisements were patently inadequate and incomplete, and clearly did not inform the appellant that "she had a right to an attorney prior to [or during] interrogation." *Id.,* 253 Ind. at 275–76, 252 N.E.2d at 791–92.

■ This case is more analogous to *Jones v. State* (1969), 253 Ind. 235, 238–44, 252 N.E.2d 572, 573–77 (DeBruler and Jackson, JJ., dissenting), *cert. denied* (1977) 431 U.S. 971, 97 S.Ct. 2934, 53 L.Ed.2d 1069, where this Court upheld admission of a confession made after the defendant had been presented with advisements virtually identical to the first advisements provided the Defendant here, and the interrogating officers had explained them. In this case the record also demonstrates that the interrogating officers read and explained the first waiver form to Defendant. There is no evidence that the officers threatened or physically abused him. The advisements

form included the statement "(y)ou have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning, ... even if you cannot afford to hire one." We conclude that the record supports the trial court's conclusion that Defendant's first statement was voluntary, and therefore admissible.

■ Assuming, *arguendo*, that Defendant's first statement should not have been admitted, we conclude the error was harmless. Outside of admitting that he was with the victim the night of the crime, which police officers already knew, Defendant's first statement did not implicate himself in her stabbing. The five-part waiver form presented and explained to Defendant prior to his second statement fully satisfied *Miranda* requirements and, as the State emphasizes, was substantially approved by this Court in *Robinson v. State* (1979), 272 Ind. 312, 315–16, 397 N.E.2d 956, 958–59. This is not a case where a second confession, preceded by proper *Miranda* warnings, was nevertheless so tainted by a suspect's prior confession rendered without adequate warnings that the second confession should have been excluded as well as the first. Defendant was fully advised of his rights to counsel before his second, substantially inculpatory statement was given to police, and it properly was admitted.

## ISSUE II

Defendant contends that the trial court erred in failing to give, *sua sponte*, an instruction allowing the jury to convict him of the lesser included offense of attempted voluntary manslaughter, see Ind.Code §§ 35–42–1–3, 35–41–5–1 (Burns 1979 Repl.), and erred in giving the court's Final Instruction No. 12 concerning voluntary intoxication as a defense. We find no reversible error.

■ Regarding the failure to give a lesser included offense instruction the State argues, and we agree, that this contention is waived on appeal because Defendant

failed to tender instructions on attempted voluntary manslaughter in writing to the trial court. *See, e.g., Anderson v. State* (1984), Ind., 469 N.E.2d 1166, 1168, *cert. denied* (1985), — U.S. —, 105 S.Ct. 1220, 84 L.Ed.2d 361; *Thomas v. State* (1983), Ind., 443 N.E.2d 1197, 1200; Ind.Rules of Procedure, Criminal Rule 8(A).

Defendant further argues that the trial court erred in giving its final Instruction No. 12 concerning the defense of voluntary intoxication, which was as follows:

"The defense of intoxication is defined by law as follows:

It is a defense that the person who engaged in the prohibited conduct did so while he was intoxicated, if the intoxication resulted from the introduction of a substance into his body, without his consent or when he did not know that the substance might cause intoxication.

Voluntary intoxication is a defense only to the extent that it negates an element of the offense referred to by the phrase 'with intent to' or 'with an intention to.'

Therefore voluntary intoxication is not a defense to Rape or Attempted Murder or the included offense of Battery as charged."

■ The instruction was taken from Ind. Code § 35–41–3–5, as amended by Acts 1980, P.L. 205, Sec. 1. However, subsequent to Defendant's trial, that statute was held to be unconstitutional in *Terry v. State* (1984), Ind., 465 N.E.2d 1085, wherein the defense of voluntary intoxication was thoroughly reviewed. Nevertheless, we find no reversible error in the court's having given the instruction. Although there was some evidence presented that the Defendant may have been intoxicated at the time he committed the crime, it was never interposed as a defense; and the record reveals that his intoxication, if existing, was not of the debilitating degree that could have raised a reasonable doubt upon the existence of the requisite *mens rea.*

Defendant did not testify. The only evidence of his intoxication came from Officer LoBianco and from Defendant's sister, Katherine Roberts. Defendant went to his sister shortly after the event and told her of the episode. She counseled him to call their acquaintance, Officer LoBianco, which he did, shortly thereafter. LoBianco met Defendant about one-half hour later, and they returned to the crime scene together, where they found the victim, still alive.

Mrs. Roberts testified that when Defendant, in the early morning hours, came to her with some of his friends, "..., they were all stoned to begin with, and I asked him what he was stoned on. He told me it was either Tuenols (phonetics) and Seconals, and they were drinking Canadian Club. It was pretty apparent they were all wrecked, all of them." She also testified that he appeared to be hyper. "... He was severely hyped up, and it was from the drugs that had gotten him that way."

Officer LoBianco testified that when he first saw Defendant he was "high" but that he could not tell what it was from, that "... his eyes were kind of reddish. He was very hyper, unsure of himself."

Defendant gave two statements to the police, one at eleven fifteen in the morning of May 17 and the second one at four twenty-five on the afternoon of May 18. By the first statement, he admitted having been with the victim earlier but that it was others who had attacked and injured her. By the second statement, he admitted that it was he and his companions who had beaten and stabbed her. In neither statement, however, did Defendant make any claim that he was intoxicated or under any disability at any time during the criminal episode.

Immediately following the criminal events, Defendant drove an automobile through the city streets some considerable distance, to the home of his sister, reported the episode to her and asked for assistance for his friend who had been cut. He had the presence of mind to heed her advice and to contact Officer LoBianco, to guide him back to the scene of the crime and to fabricate a story concerning his involve-

ment. The only relevant evidence belied a mental state so impaired by alcohol or drugs as to preclude the existence of the *mens rea*. The issue was simply not present, hence the giving of the instruction, although error, was harmless.

### ISSUE III

Defendant argues that he is entitled to a new trial because the trial judge, after instructing the jury, left the proceedings in the charge of a judge *pro tempore* when he left Indiana to attend a relative's funeral. We find no reversible error in this case.

■ Defendant relies on *Bailey v. State* (1980), Ind.App., 397 N.E.2d 1024 (*trans. denied*). In *Bailey,* which is apparently the only prior Indiana case to face this issue, our Court of Appeals concluded that a new trial was required because the trial judge had assigned the case to a judge *pro tempore* after the jury had been empaneled and one witness had testified. We decline the State's invitation to overrule *Bailey* in this case, and indeed agree with the *Bailey* court's statement that, as a general rule, a judge cannot be substituted over objection during the course of a criminal trial. *Id.,* 397 N.E.2d at 1026. The trial judge may be required to make various evidentiary rulings or to decide motions stemming from prior events during the trial with which the presiding judge must be familiar.

■ However, we do not read *Bailey* as creating a *per se* rule, and conclude that it is distinguishable. The judge *pro tempore* here performed only the ministerial act of accepting the verdict from the jury. He entertained no motions from counsel nor questions from jurors. Thus, we conclude that Defendant could not have been prejudiced by the substitution.

The judgment of the trial court is affirmed.

GIVAN, C.J., and PIVARNIK, J., concur.

DeBRULER, J., dissents with opinion.

HUNTER, J., not participating.

DeBRULER, Justice, dissenting.

For better or for worse, there is a right to remain silent in the face of custodial interrogations. There is also a right to confer with counsel in the inner sanctums of police stations before custodial police interrogations, and to have counsel present during such interrogations. And the constitution requires that these rights be extended and made meaningful for the poor, the illiterate, and the ignorant, as well as the not-so-poor, the educated, and the well-informed. To these constitutionally mandated ends, an advisement of these rights must be given openly and plainly and in a helpful manner, and the tools for their utilization thusly placed in the hands of arrested persons. *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Did appellant receive this information and these tools before either of his two custodial interrogations? The answer is no. The first time he was told by authorities in the basement of a city police station that his present and immediate right and need for counsel could not be fulfilled until some indistinct future time, "if and when" he went to court. This advisement is condemned by the holding in *California v. Prysock* (1981), 453 U.S. 355, 101 S.Ct. 2806, 69 L.Ed.2d 696, despite protestation to the contrary in the majority opinion. The second advisement is drawn so as to be uncertain on the question of time, that is, it does *not* inform the arrested person that he can have a free lawyer *now.* This uncertainty does not stand alone and in isolation, but is supplied with additional wrong meaning by the advisement given appellant on the same subject shortly before, which clearly and unmistakably said that free lawyers may be had only at some point in the future, ie., "if and when" you go to court. These circumstances do not support the conclusion reached by the majority that appellant, through the second set of advisements, was fully advised of his right to counsel as required by the constitution. I vote therefore to reverse this conviction and order a new trial at which appellant's pre-trial

statements resulting from the two custodial interrogations and any physical exhibits produced through them are excluded.