COMMONWEALTH *vs.* JOHN J. CARTER.

Hampden. March 6, 1996. - August 13, 1996.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, & GREANEY, JJ.

*Judge. Practice, Criminal,* Substitution of judge. Assistance of counsel,
    Capital case.

In the circumstances of a criminal trial, during which the trial judge became
    seriously ill and could not continue presiding for an indeterminate pe-
    riod, a substitute judge, in full compliance with Mass. R. Crim. P. 38
    (a), properly completed the proceedings. [508-514]
Discussion of the role and duties of a criminal trial judge in the context of
    a substitution for a disabled trial judge in the middle of the trial. [510-514]
A criminal defendant did not demonstrate that he received ineffective assis-
    tance of trial counsel by reason of counsel's failure to object more than
    once to the prosecutor's use of the defendant's alias or to request a
    specific curative jury instruction, or by reason of trial counsel's request
    for jury instructions on mistaken identification testimony. [514-515]

INDICTMENT found and returned in the Superior Court
Department on March 22, 1991.

The case was tried before *Constance M. Sweeney,* J.

*Steven J. Rappaport* for the defendant.

*Marcia B. Julian,* Assistant District Attorney, for the Com-
monwealth.

LIACOS, C.J. The defendant, John J. Carter, was tried
before a jury in Hampden County in September, 1992, on
indictments charging murder in the first degree and murder
for hire. The jury returned a guilty verdict as to murder in
the first degree, and acquitted as to the companion indict-
ment.

We summarize the evidence and inferences the jury could
have drawn from it. At approximately 6:30 P.M. on March 3,
1991, the defendant and Donald Vanhook drove in a blue
Subaru automobile from an apartment where one Felicia Hor-
ace lived, to the "Rainville Hotel," a building at 32 Byers
Street in Springfield. Before the two men left, Horace had

supplied the defendant with a handgun. Vanhook dropped off the defendant on a street corner near the Rainville Hotel and waited. The defendant walked toward the hotel. Approximately twenty minutes later, Vanhook heard a gunshot, and the defendant returned to the automobile. He and Vanhook returned to Horace's apartment.

A resident of the Rainville Hotel testified that he had seen a man enter the building at about 6:30 P.M. Approximately five minutes later the man emerged with the victim, Jerry Hughes. After a brief exchange of words between the two, the man who had come from the blue vehicle stepped back, reached into his jacket, pulled out a gun, and shot Hughes at point blank range, killing him. This witness did not see the shooter's face, and so could not affirmatively identify Carter as the shooter.

Several other witnesses, although they did not see the actual shooting, did place Carter at the Rainville Hotel at the time of the killing. Two residents of the building stated that they saw Carter minutes or even seconds before hearing a single gunshot. Four witnesses who had spoken with Carter after the homicide each related conversations in which, to a greater or lesser extent, Carter admitted to killing Hughes.

To demonstrate a motive for the homicide, the prosecution showed that a reputed narcotics dealer, Brian Dawson, wanted Hughes killed, that Carter knew so, and that Carter was associated with Dawson. Evidence also showed that Dawson had supplied the handgun that Horace ultimately delivered to Carter.

The defense strategy relied primarily on cross-examination of the prosecution witnesses. Many percipient witnesses had been charged with unrelated crimes or were associated with Dawson. The defense attempted to portray these witnesses as having a motive to falsely implicate Carter, either to remain in Dawson's good graces or to receive favorable treatment from police and prosecutors. Donald Vanhook, perhaps the main prosecution witness because of his role in driving Carter to the scene, did in fact arrange a plea bargain with the Commonwealth.

After the first two days of testimony, the original trial judge fell seriously ill. Subsequently, it became clear that the original judge could not, for an indefinite period, resume presiding over the trial. Another judge in the Superior Court

spoke to the jury and explained the situation. After discussions with, and argument from, counsel, this judge decided to take over and proceed with the trial from the point at which it had been suspended. Following a two-day recess, testimony was completed in just over one and one-half days. From the moment the original judge was reported incapacitated, counsel preserved Carter's rights, ultimately requesting a mistrial. That request was repeated throughout the trial and after the jury returned their verdicts.

1. In *Commonwealth* v. *Trapp*, 396 Mass. 202, 213-214 (1985), *S.C., ante* 356 (1996), we disapproved of the substitution of judges which did not comply with the requirements of Mass. R. Crim. P. 38 (a), 378 Mass. 916 (1979). We also noted that substitution was generally "of grave concern to the proper administration of justice," and cited a number of cases in other jurisdictions that expressly held such substitution to be reversible error. Indeed even the Reporters' Notes to Mass. R. Crim. P. 38 (a), Mass. Ann. Laws, Rules of Criminal Procedure at 574 (Law. Co-op. 1979), suggest that midtrial substitution of a judge without the defendant's consent "is open to constitutional inquiry." In *Trapp* we reversed the judgment on other grounds. Therefore, we did not decide the substitute judge issue.

In Carter's case the court reporter fortuitously was using advanced equipment that allowed almost immediate transcription of testimony. As a result, the substitute judge was able to review the transcript of the evidence so far introduced, and was therefore able to comply fully with rule 38 (a).[1] Hence, we now directly face the question whether substitution of

---

[1] In compliance with rule 38 (a), the substitute judge certified: "The trial judge was William W. Simons. On September 15, 1992, Judge Simons became seriously ill and as of [September 17, 1992] remains hospitalized at the Baystate Medical Center in Springfield, Massachusetts. . . .

"As a result of Judge Simons' illness, I adjourned the trial until September 17, 1992. During this 2 day adjournment I have carefully reviewed all of the pleadings and have read the actual transcript of all witnesses' testimony as well as the transcript of the jury empanellment process, opening statements, and evidentiary hearings conducted by Judge Simons.

"The immediate review of the actual testimony was made possible by computer assisted translation of the stenographic notes. In summary, I

judges, in the midst of the presentation of the evidence, is permissible. Our rule 38 (a) is modeled after Fed. R. Crim. P. 25 (a), yet we can find no case in which the Federal courts have applied that rule, in the face of objection by the defense, to a substitution during the presentation of the evidence.[2] A number of cases from other jurisdictions, mostly of early vintage, tend to support Carter's position that substitution in the midst of trial is improper.[3] Some of the scholarly commentary suggests the same. 2 C.A. Wright, Federal Practice and Procedure § 392 (2d 1982), citing Orfield, Disability of the Judge in Federal Criminal Procedure, 6 St. Louis U.L.J. 150, 151 (1960) (during Federal rulemaking process United States Supreme Court suggested possible constitutional infirmity).

Most of the cases cited were, however, generally entangled with outdated conceptions of the right to trial by jury. For example, in *Freeman* v. *United States,* 227 F. 732 (2d. Cir. 1915), the defendant consented to substitution, but it was

---

have read the entire trial record and have thus completely familiarized myself with the records of this case.

"THEREFORE, IT IS HEREBY CERTIFIED THAT PURSUANT TO MASS. R. [CRIM.] P. 38(A), JUDGE WILLIAM W. SIMONS IS UNABLE, DUE TO DISABILITY, TO PROCEED WITH THE JURY TRIAL OF JOHN J. CARTER AND I HAVE FAMILIARIZED MYSELF WITH THE RECORDS OF ALL TRIAL PROCEEDINGS TO DATE AND I AM ABLE TO PROCEED WITH AND FINISH THE TRIAL."

[2]Many defendants may prefer the continuation of trial. That course reduces legal costs that the nonindigent defendant bears personally. If the defendant is not free on bail there is also an incentive to hasten any possible acquittal and resulting release from custody. The defendant may prefer the substitute over the original judge or believe that the case is proceeding favorably. These incentives may reduce the number of cases in which substitution, rare in and of itself, is contested.

[3]*Freeman* v. *United States,* 227 F. 732, 751-754 (2d Cir. 1915); *Durden* v. *People,* 192 Ill. 493, 506 (1901); *Eagan* v. *State,* 480 N.E.2d 946, 952 (Ind. 1985); *State* v. *Davis,* 564 S.W.2d 876, 878-879 (Mo. 1978); *Blend* v. *People,* 41 N.Y. 604, 606-607 (1870); *Commonwealth* v. *Thompson,* 328 Pa. 27, 29 (1937) (approving *Commonwealth* v. *Claney,* 113 Pa. Super. Ct. 439 [1934]); *State* v. *Johnson,* 55 Wash. 2d 594, 596 (1960). See *State* v. *McClain,* 194 La. 605, 612-614 (1940) (dictum, substitution allowed after jury voir dire but before testimony); *People* v. *McCline,* 442 Mich. 127, 132-133 (1993) (dictum, substitution before opening argument proper); *State* v. *McKinley,* 7 Ohio App. 3d 255, 258 (1982) (dictum, testimony of only witness questioned with first judge presiding essentially repeated before substitute). See generally Annot., Substitution of Judges under Rule 25 of Federal Rules of Civil Procedure, 73 A.L.R. Fed. 833 (1985); Annot., Substitution of Judge in Criminal Case, 83 A.L.R.2d 1032 (1962).

believed that the defendant had no power to waive jury trial whatsoever. Compare *id.* at 742-751 with *Patton* v. *United States,* 281 U.S. 276, 298 (1929). At the time of most of these cases the right to trial by jury was, at least in this Commonwealth, understood formalistically as requiring a single tribunal comprised of both judge and jury. See generally *Opinion of the Justices,* 207 Mass. 606, 608 (1911). On such a view, a change of judge during the presentation of evidence would be no different than substituting new jurors who were only given the transcript of earlier witnesses' testimony.

Today, the jury trial guarantees of the Bill of Rights of the United States Constitution and the Declaration of Rights of the Massachusetts Constitution are understood functionally, emphasizing the interposition of lay factfinders into the judicial process. *Williams* v. *Florida,* 399 U.S. 78, 92-93 (1970). *Opinions of the Justices,* 360 Mass. 877, 879-880 (1971). The judge's role is that of neutral magistrate, generally leaving issues of fact to the lay jury. On this more modern conception of the relationship between judge and jury, substitution of a judge poses far less a problem. Compare Unif. R. Crim. P. 741 (e) (1974), 10 U.L.A. 354, 359 (Master ed. 1974) (disability of judge requires mistrial absent consent) with Unif. R. Crim. P. 741 (e) (2) (1987), 10 U.L.A. 161, 162 (Spec. Pamph. 1992) (allowing substitution over objection in jury trials). A substitute judge might perform a host of ministerial acts, such as signing a bill of exceptions, taking the jury verdict, or reading jury instructions that the first judge had prepared. See *United States* v. *LaSorsa,* 480 F.2d 522, 530-531 (2d Cir.), cert. denied, 414 U.S. 855 (1973) (substitute judge took over in midst of jury deliberations, took notes from jury that certain testimony be read back, and received verdicts); *Eagan* v. *State,* 480 N.E.2d 946 (Ind. 1985) (substitute judge heard no motions from counsel and merely accepted jury verdict).

Virtually all the decisions that a trial judge must make, even when the judge has discretion as to the precise result, are decisions of law. See *People* v. *Thompson,* 158 Misc. 2d 397, 408-409 (N.Y. Sup. Ct. 1993). Appellate courts routinely decide what jury instructions are appropriate, whether closing arguments remained within the bounds of the evidence and inferences, and whether the evidence was legally sufficient to support the verdict. These appellate decisions are made on a

cold record and are thought sufficient to protect the defendant's rights.[4] The substitute judge who views even a portion of the evidence firsthand is certainly in no worse a position.[5]

Within the criminal jury trial the judge does make one decision that might require first-hand observation of all the witnesses. Immediately after the verdict the defendant can renew a motion for a directed verdict and move, in the alternative, for a reduction of the verdict or a new trial.[6] These latter two determinations require the judge to weigh the evidence, including, to some extent, the credibility of the witnesses. Carter asserts that the substitute judge, who reviewed only

[4]Like the New York practice discussed in *People* v. *Thompson,* 158 Misc. 2d 397 (N.Y. Sup. Ct. 1993), Massachusetts judges cannot make any comment on the evidence that communicates the judge's belief that either party should win the case. E.g., *Commonwealth* v. *McColl,* 375 Mass. 316, 321 (1978).

[5]When the judge is the finder of fact, as in a voir dire as to voluntariness under our humane practice, a suppression motion, or prerequisites to admissibility (e.g., authentication of exhibits, qualification of experts), the judge is instead cast directly in the role of deciding credibility issues. We do not decide today whether a substitute judge may act as factfinder after hearing only a portion of the relevant testimony first-hand.

[6]The Commonwealth claims that Carter's motion pursuant to Mass. R. Crim. P. 25 (b) (2) asked only for a required finding of not guilty, based on the heading of Carter's court papers and the motion's citation only to *Commonwealth* v. *Latimore,* 378 Mass. 671, 677 (1979), *S.C., ante* 129 (1996). The Commonwealth argues that in this case the substitute judge did not consider any fact-bound issue that required firsthand observation of the witnesses.

We note that, one week after the rule 25 (b) (2) motion, Carter made a motion for a new trial pursuant to Mass. R. Crim. P. 30 (b). He has not appealed from the denial of his motion for new trial. In *Commonwealth* v. *Preston,* 393 Mass. 318 (1984), we treated an immediate postverdict 30 (b) motion as, in substance, a rule 25 (b) (2) motion for new trial. Motions pursuant to the second sentence of rule 25 (b) (2) have no particular time limit. But see and compare Reporters' Notes to Mass. R. Crim. P. 30, Mass. Ann. Laws, Rules of Criminal Procedure at 483 (Law. Co-op. 1979) (rule 30 procedure covers all true postconviction, i.e., postappeal, motions for new trial). The one-week delay does not distinguish this case from *Preston.*

In the final analysis, we simply read all the immediate postverdict pleadings together and look to their substance, and we treat Carter's request for a new trial under rule 25 (b) (2), as in part claiming that the verdict was against the weight of the evidence. Compare *Commonwealth* v. *Doucette,* 408 Mass. 454, 455-457 (1990) (motion and ruling thereon clearly contemplated only claim of legal insufficiency of the evidence).

the cold transcript of the proceedings to that point, could not properly rule on such a motion, and the resulting alleged prejudice is what makes midtrial substitution impermissible.[7] In Carter's case the substitution occurred before the verdict. To the extent Carter's complaint centers around a Mass. R. Crim. P. 25 (b) (2) postverdict motion, we can take some guidance from rule 38 (b) which specifically authorizes a substitute judge to conduct all postverdict activities.

To take on the point more directly, when a substitute judge decides a rule 25 (b) (2) motion, all that is lost is any effect that firsthand observation of the trial has on an already discretionary decision. The immediate postverdict new trial motion allows the trial judge to mold the verdict in light of experience with verdicts in other cases. The judge's opinion of witness credibility can affect that latter decision, and a new trial or verdict reduction may be proper even when the evidence can legally support the jury's verdict. See, e.g., *Commonwealth* v. *Doucette*, 408 Mass. 454, 455-456 (1990). But the judge is not to play the role of thirteenth juror. Cf. *Commonwealth* v. *Gaulden*, 383 Mass. 543, 555-556 (1981) (rule 25 [b] [2] decisions are not meant to "second guess the jury"). The defendant who "loses" a judge's firsthand view of some of the evidence has lost only a de minimis portion of the considerations that enter into the rule 25 (b) (2) decision. See *id*. at 556, and cases cited.

Carter has pressed his claims in terms of the right to trial by jury, but he also advances more general due process arguments. To some extent this is merely the same argument in

---

[7]A true postconviction motion for new trial, pursuant to Mass. R. Crim. P. 30, is an entirely different matter. It is well settled that, although it is preferable that such motion be decided by the original trial judge, decision by a different judge of the same court is entirely proper. *Commonwealth* v. *Gedzium*, 261 Mass. 299, 300, 308-309 (1927) (postappeal new trial motion asserting prosecutorial discovery violation, motion pursuant to the precursor of rule 30, G. L. c. 278, § 29, repealed by St. 1979, c. 344, § 46).

Former § 29 applied to both immediate postverdict and postappeal new trial motions. That the *Gedzium* holding applies only to "true" postconviction relief, in the nature of today's rule 30 motions, is apparent from the facts of the case, *id*. at 300 (citing affirmance on direct appeal), and the citation to *Opinion of the Justices*, 207 Mass. 606, 609 (1911) (jury trial right is right to a single judge and jury and continues from empanelment *"until a verdict is returned to which no valid objection is made"*). *Gedzium, supra* at 305. Our other subsequent cases, and those referred to in *Gedzium*, all involved motions in the nature of rule 30 motions.

different clothing. But there is some merit to the notion that allowing midtrial substitution of judges gives some criminal defendants better treatment than others. Some defendants have their rule 25 (b) (2) motion ruled on by judges with the advantage of first-hand observation. Other defendants, like Carter, lose that unique view of the case. Cf. Reporters' Notes to Mass. R. A. P. 15 (d), Mass. Ann. Laws, Rules of Appellate Procedure at 111 (Law. Co-op. 1979) (new trial motion claiming verdict against the weight of the evidence implicates greater need for familiarity with original proceeding, as compared to claim of newly discovered evidence). However, this difference in treatment is not without reason. Rule 38 (a) allows substitution only for "death, disease, or other disability" of the trial judge. Such disability constitutes "manifest necessity" sufficient to allow retrial despite double jeopardy considerations, see *United States* v. *Lynch*, 598 F.2d 132, 135 (D.C. Cir. 1978), cert. denied, 440 U.S. 939 (1979), and cases cited, and is certainly enough to allow the de minimis infringement that occurs when the judge ruling on the merely statutorily mandated rule 25 (b) (2) motion has not observed every witness first hand.

In the present context of an appeal from a conviction of murder in the first degree, Carter has an advantage over other criminal defendants convicted of lesser crimes. Although the substitute judge could not provide a new trial decision based on complete firsthand observation, Carter has the benefit of our independent review, pursuant to G. L. c. 278, § 33E (1994 ed.), of the entire record. This authority to reduce the verdict or grant new trial is identical to the power of the trial judge under rule 25 (b) (2). See *Gaulden, supra* at 553. Compare *Randel* v. *Beto*, 354 F.2d 496, 501-502 (5th Cir. 1965), cert. denied, 387 U.S. 935 (1967) (substitution of trial judge improper because trial judge could examine weight of evidence while appellate court could grant new trial motion only if evidence legally insufficient). Both sorts of review provide "a general sense of uniformity" of "treatment of convicted defendants." *Gaulden, supra* at 554. Carter's complaint is that his case could not be reviewed in one very particular, highly discretionary, manner. He would like a very particular kind of bite at the apple. The law is content with giving him two bites instead.

In the final analysis the procedure of rule 38 (a), requiring

the substitute judge to certify familiarity with the record of the case to that point, comports with modern notions of the structure of criminal trials. See *People* v. *Espinoza*, 3 Cal. 4th 806, 827-830 (1992), cert. denied, 512 U.S. 1253 (1994). Neither the Constitution of the United States nor the Declaration of Rights demands more.[8]

2. Carter's appellate counsel asserts that trial counsel was ineffective. We have repeatedly stated that in a case like this errors not properly preserved fall within our review pursuant to G. L. c. 278, § 33E. That review searches for any substantial likelihood of a miscarriage of justice and evaluates the joint and several conduct of prosecutor, defense counsel, and the judge. Our statutory duty provides more favorable review to the defendant than our ineffective assistance jurisprudence. See, e.g., *Commonwealth* v. *Burke*, 414 Mass. 252, 256-257 (1993). With these considerations we turn to the particular assignments of error.

Throughout the trial the prosecutor and the witnesses referred to the defendant by an alias, "Kilo."[9] The original judge partially denied a pretrial motion in limine by which the defense sought to have this nickname excluded from the trial. As testimony proceeded, defense counsel complained that the prosecutor's questioning continuously used this nickname. The judge agreed that, although the witnesses could use the alias, the prosecutor should use the defendant's proper name. The prosecutor continued nonetheless. The alleged ineffective assistance lies in the failure of counsel to object further and failure to request a specific curative jury instruction.

Aliases can be suggestive of bad character and prior criminality, and therefore raise a possibility that the jury will improperly consider criminal propensity. See, e.g., *Commonwealth* v. *Sheline*, 391 Mass. 279, 285-287 (1984). In this case, however, the jury charge included a specific instruction

---

[8]The substitute judge made it clear, in certifying in writing (as rule 38 requires) all the findings necessary to her decision to continue the trial, gave the defendant full opportunity to be heard, and conducted an individual voir dire of the members of the jury to determine that the jurors would not be prejudiced by her decision to continue the trial as substitute judge. Additionally, the defendant has shown no actual prejudice suffered by him but relies instead on allegations of potential prejudice.

[9]Other persons were referred to by their nicknames or their aliases including the victim ("Polo").

warning the jury against improper consideration of "evidence . . . referring to alleged drug dealing." This curative instruction admittedly did not immediately follow the troublesome references, and that to some extent weakens the shield the charge provided. Nevertheless, the defendant's alias suggested only generalized evidence of wholly unspecified prior wrongful conduct. This was merely cumulative with far more specific and proper references to prior domestic violence that had landed the defendant in jail. There was also ample other and more direct evidence of the defendant's familiarity with drugs. The use of this alias did not generate sufficient prejudice to create a substantial likelihood of a miscarriage of justice.[10]

Carter also claims that it was ineffective assistance of counsel for trial counsel to request a *"Rodriguez/Pressley"* charge to the jury, which instructs the jury on relevant considerations in identification testimony. See *Commonwealth* v. *Rodriguez*, 6 Mass. App. Ct. 738, 742-744 (1978), *S.C.*, 378 Mass. 296, 302 (1979). See also *Commonwealth* v. *Pressley*, 390 Mass. 617, 620 (1983). Hindsight analysis leads appellate counsel to believe that a better strategy would have been to downplay the usual methods of attack on eyewitness identification, in favor of placing emphasis on the inability of the lone eyewitness to the actual shooting to make an unequivocal, certain identification. This is second guessing. Indeed, to make the tactical choice now suggested — not requesting a charge as to "honest and reasonable mistake" — might itself constitute ineffective assistance of counsel in some situations. Cf. *Commonwealth* v. *Gelpi*, 416 Mass. 729, 730-731 (1994). There was no error.

---

[10]Carter also assigns error to several occasions, during trial, that made mention of prior bad acts. Carter had been incarcerated on charges relating to a domestic dispute until 1:15 P.M. on the day of the killing, at which time he was released on recognizance. This evidence was relevant to show motive and state of mind. It was also relevant as foundation to show his presence at the scene of the crime, because his recognizance form was found in Horace's apartment. During the jury charge the substitute judge gave forceful instructions that limited the jury's consideration of the prior bad acts evidence. The prosecutor was careful to avoid describing any details of the prior bad acts. There was no error.

3. We have reviewed the entire record pursuant to our G. L. c. 278, § 33E, duty. We discern no other reversible error warranting a new trial and find no reason to reduce the verdict to a lesser degree of guilt.

*Judgment affirmed.*